2006 ME 48

**A. Michelle COBB**

v.

**BOARD OF COUNSELING
PROFESSIONALS
LICENSURE.**

Supreme Judicial Court of Maine.

Argued: June 15, 2005.
Decided: May 3, 2006.

Rufus E. Brown, Esq. (orally), M. Thomasine Burke, Esq., Brown & Burke, Portland, for plaintiff.

G. Steven Rowe, Attorney General, Judith M. Peters, Asst. Atty. Gen. (orally), Robert C. Perkins, Asst. Atty. Gen., Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.*

Majority: SAUFLEY, C.J., and CALKINS, and LEVY, JJ.

Concurrence: SAUFLEY, C.J.

Concurrence: CLIFFORD, J.

---

* Justice Paul L. Rudman sat at oral argument and participated in the initial conference, but retired before this opinion was certified.

Dissent: DANA and ALEXANDER, JJ.

CALKINS, J.

[¶ 1] A. Michelle Cobb appeals from a judgment entered in the Superior Court (Cumberland County, *Crowley, J.*) affirming the decision of the Board of Counseling Professionals Licensure to discipline her for diagnosing and treating mental health disorders in violation of 32 M.R.S. § 13858 (2005). Cobb, who is a licensed professional counselor (LPC), contends that 32 M.R.S. § 13858 does not prohibit her from diagnosing and treating mental health disorders and that the Board's interpretation of the statute is arbitrary and capricious. She also contends that because the Board construed the statute in a disciplinary adjudication instead of a rulemaking proceeding, it violated the rulemaking provisions of the Administrative Procedure Act (APA). 5 M.R.S. § 8052 (2005). She further argues that her rights under the Due Process Clauses of the United States and Maine Constitutions were violated because 32 M.R.S. § 13858 is void for vagueness. We affirm the Superior Court's affirmance of the Board's decision.

## I. BACKGROUND

[¶ 2] The statutory scheme regulating professional counselors describes three types of counselors in addition to the LPC: (1) licensed clinical professional counselor (LCPC); (2) marriage and family therapist; and (3) pastoral counselor.[1] 32 M.R.S. §§ 13851(2), (7), (7–A), (9), 13858(1) to (3–A) (2005). Cobb has held the LPC license since 1993.

[¶ 3] In 2001, the parents of two children Cobb was counseling filed a complaint against her with the Board. The Board charged Cobb with operating beyond the scope of her license. Specifically, it alleged that she had diagnosed and treated

---

1. The statute defines the categories as follows:

**2. Clinical professional counselor.** "Clinical professional counselor" means a professional counselor who renders or offers to render for a fee, monetary or otherwise, to individuals, families, groups, organizations or the general public, a counseling service involving the application of the principles and procedures of counseling to assess and treat intrapersonal and interpersonal problems and other dysfunctional behaviors and to assist in the overall development and adjustment of those served.

. . . .

**6. Marital and family therapy services.** "Marital and family therapy services" means the assessment and treatment of intrapersonal and interpersonal problems through the application of principles, methods and therapeutic techniques for the purpose of resolving emotional conflicts, modifying perceptions and behavior, enhancing communication and understanding among all family members, and preventing family and individual crises.

**7. Marriage and family therapist.** "Marriage and family therapist" means a person who renders or offers to render for a fee, monetary or otherwise, marital and family therapy services.

**7–A. Pastoral counselor.** "Pastoral counselor" means an individual who is trained and certified to provide for a fee, monetary or otherwise, pastoral counseling, which is ministry to individuals, families, couples, groups, organizations and the general public involving the application of principles and procedures of counseling to assess and treat intrapersonal and interpersonal problems and other dysfunctional behavior of a social and spiritual nature, and to assist in the overall development and healing process of those served.

. . . .

**9. Professional counselor.** "Professional counselor" means a person who, for a fee, monetary or otherwise, renders or offers to render to individuals, families, groups, organizations or the general public a service involving the application of principles and procedures of counseling to assist those served in achieving more effective personal, emotional, social, educational and vocational development and adjustment.

32 M.R.S. § 13851(2), (6) to (7–A), (9) (2005).

mental health disorders, which was beyond the scope of her LPC license.

[¶ 4] Prior to the Board hearing in 2002, the parties signed a stipulation of facts, in which Cobb admitted that "[d]uring the course of professional treatment [she] rendered diagnoses" of the two children and submitted insurance reimbursement forms with the diagnoses. The parties agreed that the preliminary issue for decision by the Board was whether an LPC is authorized to diagnose and treat mental health disorders. The Board interpreted 32 M.R.S. § 13858 as prohibiting LPCs from diagnosing and treating mental health disorders. The pertinent language of section 13858 is: "The license categories 'licensed clinical professional counselor,' 'licensed pastoral counselor' and 'licensed marriage and family therapist' are of equivalent clinical status. Clinical status grants the ability to diagnose and treat mental health disorders."

[¶ 5] The Board found that Cobb violated this prohibition by diagnosing and treating the two children. It censured Cobb; imposed a fine of $500 and costs of $500; and ordered her to receive thirty hours of supervision.

[¶ 6] Cobb appealed to the Superior Court, which pointed out that the parties' stipulation did not state that Cobb had diagnosed "mental health disorders," and found that the Board had erred in not allowing evidence as to the definition of that phrase. The court held that the Board's interpretation of section 13858 was correct and that an LPC does not have the authority to diagnose and treat mental health disorders. It further disagreed with Cobb's contention that the Board had engaged in unlawful rulemaking. The court remanded the matter for the Board to take additional evidence on the meaning of "mental health disorders" as it is used in section 13858 and to determine whether Cobb had diagnosed "mental health disorders."

[¶ 7] On remand, the Board heard expert testimony on the meaning of "mental health disorders." It concluded that conditions deemed "mental health disorders" in the Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DSM–IV) constitute "mental health disorders" for purposes of section 13858. The Board further found that Cobb had, in fact, diagnosed mental health disorders when she filled out the insurance reimbursement forms for the two children. On the forms, under the heading "Diagnosis," Cobb used codes from the DSM–IV for "Oppositional Defiant Disorder" and "Adjustment Disorder with Disturbance of Conduct." The Board found that these are mental health disorders in the DSM–IV, and it further found that these same diagnostic terms were in Cobb's treatment notes. It concluded that Cobb had diagnosed and treated the two children for mental health disorders. The Board reinstated its earlier censure, fine, and supervision order, but it increased the amount of costs to one-half of the actual costs, not to exceed $1500.

[¶ 8] Cobb appealed again to the Superior Court, arguing that (1) the Board's interpretation of section 13858 was arbitrary and capricious; (2) it violated the rulemaking procedures of the APA; (3) it was estopped from prosecuting her because its own actions had induced her to act and she had relied upon those actions; (4) section 13858 is unconstitutionally vague; (5) the imposition of costs was arbitrary and capricious; and (6) she was entitled to attorney fees. The court affirmed the Board's decision.

## II. DISCUSSION

[¶ 9] Cobb has not pursued, on appeal to this Court, all of the arguments she urged

in the Superior Court. She has narrowed the issues to three: (1) whether the Board's interpretation of section 13858 is arbitrary and capricious; (2) whether its prosecution of her for violating section 13858 is unlawful because it had not promulgated rules interpreting the statute; and (3) whether her rights to due process have been violated because section 13858 is void for vagueness.[2]

## A. Standard of Review

■ [¶ 10] Because the Superior Court was acting in an appellate capacity, we review the decision of the Board directly. *See Munjoy Sporting & Athletic Club v. Dow*, 2000 ME 141, ¶ 6, 755 A.2d 531, 536. " 'The standard of review is limited to whether the [governmental agency] abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record.' " *Id.* (quoting *Davric Me. Corp. v. Me. Harness Racing Comm'n*, 1999 ME 99, ¶ 7, 732 A.2d 289, 293). We will vacate

the decision [only] if the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by bias or error of law;

(5) Unsupported by substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C) (2005).

■ [¶ 11] Regarding the first issue raised in this appeal, which is the interpretation of section 13858, the cardinal rule of statutory interpretation is to give effect to the intention of the Legislature. We discern legislative intent from the plain meaning of the statute and the context of the statutory scheme. *Brent Leasing Co., Inc. v. State Tax Assessor*, 2001 ME 90, ¶ 6, 773 A.2d 457, 459. All words in a statute are to be given meaning, and none are to be treated as surplusage if they can be reasonably construed. *Stromberg–Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566, 569.

■ [¶ 12] The statutory construction statute provides: "Technical words and phrases and such as have a peculiar meaning convey such technical or peculiar meaning." 1 M.R.S. § 72(3) (2005). "In construing a statute, technical or trade expressions should be given a meaning understood by the trade or profession." *State v. Vogl*, 149 Me. 99, 109, 99 A.2d 66, 70 (1953).

■ [¶ 13] When a case concerns the interpretation of a statute that an administrative agency administers and that is within its area of expertise, our scope of review is to determine first whether the statute is ambiguous. *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046. If the statute is unambiguous, we do not defer to the agency's construction, but we interpret the statute according to its plain language. *Id.* If the statute is ambiguous, we defer to the agency's interpretation, and we affirm the agency's interpretation unless it is unreasonable. *Id.* This is the same two-step analysis developed by the United States Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court described the function of a court in the first step as follows: "If a court, employing traditional tools of statutory construction, ascertains

**2.** She also claims that she is entitled to an award of attorney fees if she prevails.

that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9.

## B. The Board's Interpretation of Section 13858

[¶ 14] The first issue is whether 32 M.R.S. § 13858 is ambiguous regarding the authority of LPCs to diagnose and treat mental health disorders. The Board interpreted section 13858 to mean that LPCs are not authorized to diagnose and treat mental health disorders. Section 13858 describes which licensees have clinical status and states that "[c]linical status grants the ability to diagnose and treat mental health disorders." The salient question is whether the statute unambiguously reflects a legislative intention that licensees who do not have clinical status are without the authorization to diagnose and treat mental health disorders.

[¶ 15] The plain language of section 13858 grants clinical status to three of the four categories of licensed counselors, and it provides that licensees with clinical status have the authority to diagnose and treat mental health disorders: "The license categories 'licensed clinical professional counselor,' 'licensed pastoral counselor' and 'licensed marriage and family therapist' are of equivalent clinical status. Clinical status grants the ability to diagnose and treat mental health disorders." 32 M.R.S. § 13858.

[¶ 16] Section 13858 plainly does not give clinical status to the category of LPC. Nowhere do the licensing statutes grant LPCs clinical status or otherwise give LPCs the authority to diagnose and treat mental health disorders. The statute plainly and unambiguously denies clinical status to LPCs, and because it only authorizes licensees with clinical status to diagnose and treat mental health disor-

ders, LPCs do not have the authority to do so.

[¶ 17] The text of the statutory scheme reinforces this interpretation. The definitional statute gives LPCs the authority to render services to "assist" their clients "in achieving more effective personal, emotional, social, educational and vocational development and adjustment." 32 M.R.S. § 13851(9). This is in contrast to LCPCs, who have the authority "to assess and treat intrapersonal and interpersonal problems and other dysfunctional behaviors." 32 M.R.S. § 13851(2). LPCs, LCPCs, and pastoral counselors apply the principles and procedures of counseling, 32 M.R.S. § 13851(2), (7–A), (9), which procedures are defined in 32 M.R.S. § 13851(8):

> **8. Procedures of counseling.** "Procedures of counseling" means methods and techniques that include, but are not limited to, the following.
>
> A. "Assessment" means selecting, administering and interpreting instruments designed to assess personal, interpersonal and group characteristics.
>
> B. "Consulting" means the application of scientific principles and procedures in counseling to provide assistance in understanding and solving a current or potential problem that the client may have in relation to a 3rd party, be it an individual, a family, a group or an organization.
>
> C. "Counseling" means assisting individuals, families or groups through the counseling relationship to develop understanding of intrapersonal and interpersonal problems, to define goals, to make decisions, to plan a course of action reflecting their needs, and to use information and community resources, as these procedures are related to personal, social, educational and vocational development.

**D.** "Referral" means the evaluation of information to identify needs or problems of the counselee and to determine the advisability of referral to other specialists, informing the counselee of that judgment, and communicating as requested or deemed appropriate with referral sources.

[¶ 18] These procedures involve "assessment," which in turn is defined to mean "selecting, administering and interpreting instruments designed to assess personal, interpersonal and group characteristics." 32 M.R.S. § 13851(8)(A). Although application of the procedures of counseling give LPCs, such as Cobb, the authority to perform assessments, LPCs are not granted the same authority to "assess and treat intrapersonal and interpersonal problems and other dysfunctional behavior" that LCPCs and pastoral counselors are given. *Compare* 32 M.R.S. § 13851(2), (7–A), *with* 32 M.R.S. § 13851(8)(A), (9).

[¶ 19] The requirements for licensure differ for the four categories of licenses. Among the many requirements, three of the license categories are required to have clinical training. LCPCs are required to have a minimum of 3000 hours of supervised clinical experience, 32 M.R.S. § 13858(2)(B); marriage and family therapists are required to have a one-year clinical practicum as well as 1000 hours of direct clinical contact, 32 M.R.S. § 13858(3); and pastoral counselors are required to have 400 hours of clinical pastoral education, 32 M.R.S. § 13858(3–A)(B). These are the three license categories that are granted clinical status in section 13858. In contrast, LPCs are not required to have any clinical training. *See* 32 M.R.S. § 13858(1).

[¶ 20] Looking at this statutory scheme as a whole, it is apparent that the Legislature intended to limit the authority to diagnose and treat mental health disorders to those licensees with clinical status. Furthermore, it is only the licensees with clinical training that are granted clinical status. If the Legislature had intended that all licensees have the authority to diagnose and treat mental health disorders, it would not have enacted, in 1999, the language of section 13858 which states that "[c]linical status grants the ability to diagnose and treat mental health disorders." If the Legislature had intended that all licensees have diagnostic and treatment authority, this language would be mere surplusage, intended to have no effect. However, because no language is to be treated as surplusage if it can be reasonably construed, we must give meaning to this language. The reasonable construction of this language, within the context of the statutory scheme, is that only those licensees who hold clinical status have the authority under their license to diagnose and treat mental health disorders. Under the statutes, LPCs do not have clinical status. Instead, they have the authority to "assist" clients "in achieving more effective personal, emotional, social, educational and vocational development and adjustment." 32 M.R.S. § 13851(9).

[¶ 21] Section 13858 does not give authority to all licensees to diagnose and treat mental health disorders. It is unambiguous in limiting such authority to licensees with clinical status. Because the statute is unambiguous and the legislative intention is clear, we do not defer to the Board's interpretation.[3] The Board, however, reached the correct interpretation,

---

3. Because we conclude that the statute is unambiguous and that it does not give LPCs the authority to diagnose and treat mental health disorders, we need not reach Cobb's argument that the Board's interpretation of the statute is arbitrary or unreasonable.

and, therefore, its interpretation must be affirmed.

## C. Rulemaking

[¶ 22] Cobb argues that the Board violated the rulemaking provisions of the APA when it interpreted section 13858 in an adjudicative proceeding for the first time. Cobb makes this contention both with regard to the Board's interpretation that LPCs are not authorized to diagnose and treat mental health disorders and with regard to its interpretation of the term "mental health disorders." Cobb contends that the Board was first required to promulgate a rule articulating its interpretation and to do so in accordance with the rulemaking provisions of the APA, 5 M.R.S. § 8052, before it could apply the interpretation to her.

[¶ 23] The term "rule" is defined in the APA as a "regulation, standard, code, statement of policy, or other agency statement of general applicability ... that is or is intended to be judicially enforceable and implements, interprets or makes specific the law administered by the agency." 5 M.R.S. § 8002(9)(A) (2005). However, specifically excepted from this definition are "[d]ecisions issued in adjudicatory proceedings." 5 M.R.S. § 8002(9)(B)(3). The Board has adjudicative responsibilities, 32 M.R.S. § 13853(12) (2005), and there is no question that the interpretation of section 13858 was the result of an adjudicative proceeding. Thus, the interpretation of section 13858 does not meet the definition of "rule" in the APA, and the Board was not required to engage in formal rulemaking.

[¶ 24] As part of its adjudicative responsibility, the Board had the obligation to apply the statute that was at issue in the proceeding. When a party to an agency adjudicative proceeding raises a question about a statute's meaning or scope and the statute is one administered by the agency, the agency must interpret it if the interpretation is necessary to the adjudicative decision. Agencies are not required to promulgate rules defining every statutory term that might be called into question. They are expected to apply statutes within their expertise as cases arise. *See Mitchell v. Me. Harness Racing Comm'n,* 662 A.2d 924, 926–27 (Me. 1995).

## D. Due Process

[¶ 25] Cobb argues that section 13858 is void for vagueness and thereby violates the Due Process Clauses of the United States and Maine Constitutions. Essentially Cobb argues that she was unable to discern from the statute that she was not allowed to diagnose and treat.

[¶ 26] A statute is considered unconstitutionally vague when "it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). The United States Supreme Court has stated that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *see Northeast Occupational Exch., Inc. v. State,* 540 A.2d 1115, 1117 (Me.1988) (stating that economic regulations are sufficiently definite "if the affected person can understand what the regulations require, even though some

doubt may arise when marginal cases are considered").

[¶ 27] Cobb argues that because there was discussion by members of the Board during the deliberations in her case about confusion in the "counseling world" as to whether LPCs could diagnose and treat, this is an indication that the statute did not apprise licensees of the scope of their authority. However, the discussion also noted that there was a difference of opinion among counselors on this issue and that Cobb should have been aware of that controversy.

[¶ 28] The statutory scheme regulating LPCs is not void for vagueness. It specifically states that only counselors holding clinical status are authorized to diagnose and treat, and LPCs do not have clinical status. Cobb's constitutional challenge does not succeed.

The entry is:

Judgment affirmed.

SAUFLEY, C.J., concurring.

[¶ 29] I concur in the opinion of the Court, and write separately to address an issue not raised by the parties and, therefore, not addressed by this Court. The Board, and those who look to the Board for guidance, would benefit from an articulation of the rationale for a particular sanction.

[¶ 30] Specifically, although the Board's interpretation of the statute at the point of trial was both reasonable and based on the language of the statute itself, it is fairly clear from the proceedings that the Board has not previously enforced its holding that an LCP is not authorized to diagnose and treat mental health disorders. Indeed, uncontested evidence at the hearing demonstrated that Cobb had engaged in diagnosis and treatment, under appropriate supervision, for a number of years, without an objection being raised by her supervisors or the Board.

[¶ 31] Given the silence on this issue that preceded the Board's announcement of its interpretation of the statute, its determination that Cobb should be sanctioned by censure, costs of $1113.50, a fine of $500, and *thirty hours* of supervision seems excessive to members outside the counseling community. However, the Board appears to have considered the actual censure to be necessary and to have considered the thirty hours of supervision de minimis. Had the excessiveness or appropriateness of the sanction been before us in this appeal, the record may have been insufficient for meaningful judicial review. *See Christian Fellowship & Renewal Ctr. v. Town of Limington,* 2001 ME 16, ¶ 15, 769 A.2d 834, 839.

[¶ 32] Accordingly, in order to provide us enough information to determine that the sanction is proportionate to the offense, administrative boards will be well served to detail the rationale for the type and amount of the sanction imposed.

CLIFFORD, J., concurring.

[¶ 33] I concur in the result reached by the Court, and I would affirm the judgment, but I would do so on different grounds than the Court.

[¶ 34] For many of the reasons stated in the dissent, and in particular the inconsistencies and lack of clarity in the statutory language, I would conclude that 32 M.R.S. § 13858 (2005) is ambiguous. Because the statute is ambiguous, I would look to the construction of the statute given by the Board of Counseling Professionals Licensure, which is charged with the statute's administration. "An agency's interpretation of an ambiguous statute it administers is reviewed with great deference and will be upheld unless the statute plainly com-

pels a contrary result." *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n,* 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046 (quotation marks omitted).

[¶ 35] The Board concluded that section 13858 does not grant to licensed professional counselors the authority to "diagnose and treat mental health disorders." Although the language of section 13858 specifically grants such authority to "licensed clinical professional counselor[s]," "licensed pastoral counselor[s]," and "licensed marriage and family therapist[s]," it does *not* explicitly grant that authority to "licensed professional counselors." In my view, the Board's interpretation of the statute to that effect is reasonable and does not plainly contradict its language. Accordingly, it is a construction to which I would defer. *See Competitive Energy Servs.,* 2003 ME 12, ¶ 15, 818 A.2d at 1046.

[¶ 36] Moreover, contrary to the dissenting opinion, in my view, 32 M.R.S. §§ 13851–13865 (2005) is not a penal statute. Rather, as we have concluded with regard to a statute governing real estate brokers, the purpose of the sanctions set out in the statute is "regulatory and not penal." *Me. Real Estate Comm'n v. Anderson,* 512 A.2d 351, 353 (Me.1986). The statute at issue here, governing counseling professionals, is similar in purpose to that governing real estate brokers. *See* 32 M.R.S. §§ 13061–13069 (2005). Pursuant to both statutes, the Commission or Board has authority to assess a fine. 10 M.R.S. § 8003(5)(A–1)(3) (2005); 32 M.R.S. § 13068(2)(C) (governing the Real Estate Commission); 32 M.R.S. § 13861 (governing the Board of Counseling Professionals Licensure). Notwithstanding that those provisions allow for the imposition of a fine, both are regulatory rather than penal, and should not be construed in the strict fashion urged by the dissent.

[¶ 37] As to the sanctions imposed on Cobb by the Board, I agree with the views stated by Chief Justice Saufley in her concurring opinion.

DANA, J., with whom ALEXANDER, J., joins, dissenting.

[¶ 38] Although A. Michelle Cobb has been diagnosing and treating mental health disorders since the 1980s, and with the knowledge and acquiescence of the Board of Counseling Professionals Licensure since 1993, the Board concluded and the Court concludes today that an amendment to the statute in 1999, 32 M.R.S. § 13858 (2005), unambiguously renders that conduct unauthorized.

[¶ 39] Because the amendment to the statute is, at the very least, ambiguous; because other sections of the statute and the Board's rules, regulations, and forms seem to authorize Cobb to diagnose and treat mental health disorders; because the Board's supervisor failed to advise her that continuing to practice her profession was unauthorized; because the Board itself recognized that the statute was unclear; and because the Board, nevertheless, imposed an arbitrary penal sanction, I respectfully dissent.

I. BACKGROUND

[¶ 40] It is undisputed that when Cobb first applied for licensure pursuant to the Counseling Professionals statute, the statute provided that existing counselors who met certain basic qualifications could elect to be licensed as either: a professional counselor (LPC), a clinical professional counselor (LCPC), a marriage and family therapist, or a pastoral counselor. *See* 32 M.R.S.A. § 13858(6) (Supp.1991) *repealed by* P.L.1995, ch. 259, § 1 (effective September 29, 1995) (grandfathering counselors who held masters degrees in counseling, an allied mental health field, or behavioral or social science; had supervised experience or passed an exami-

nation; and were actively engaged in counseling for two of the five years prior to January 1, 1991). Cobb elected to be licensed as a professional counselor.

[¶ 41] During the 1980s and 1990s, Cobb worked as a school counselor and started her private practice. In compliance with the statute, Cobb was periodically supervised. One of her supervisors, Dr. John Sutton Jr., a former member of the Board and a Professor of Counselor Education at the University of Southern Maine, filed multiple reports with the Board stating that Cobb "engaged in all the usual functions of prevention, diagnosis, and treatment of mental health disorders." At no time did the Board, Sutton, or any of Cobb's other supervisors notify her that she was exceeding the scope of her license by diagnosing and treating mental health disorders.

## II. DISCUSSION

### A. Section 13858 is Ambiguous

1. The Statute, 32 M.R.S. § 13858, Does Not Explicitly Prohibit a LPC From Diagnosing and Treating Mental Health Disorders

[¶ 42] Title 32 M.R.S. § 13858 provides, in pertinent part:

The license categories "licensed clinical professional counselor," "licensed pastoral counselor" and "licensed marriage and family therapist" are of equivalent clinical status. Clinical status grants the ability to diagnose and treat mental health disorders.

On its face, the statute indicates that three classes of counselors are specifically granted the authority to diagnose and treat mental health disorders. The Board's and the Court's reasoning is that because certain designated counselors and therapists have been awarded the "clinical" label, which explicitly authorizes them to "diagnose and treat mental health disorders," the "negative pregnant" is that professional counselors lacking the "clinical" label must be prohibited from diagnosing and treating mental health disorders. Nothing in the amendment, however, affirmatively prohibits a LPC from diagnosing and treating.[4]

2. The Statute Regulating LPCs is Not a Model of Clarity

[¶ 43] The statute regulating this profession is a caldron of ambiguity. Many of the key words and phrases used in defin-

---

4. The Legislature knows how to be explicit when it wants to prohibit or limit the practice of professionals. See 32 M.R.S. § 1094–E (2005) (enumerating procedures that an expanded function dental assistant may not perform); 32 M.R.S. § 3113–A (2005) ("A licensed physical therapist or physical therapist assistant may not administer drugs except upon the referral of a duly licensed doctor of medicine, surgery, osteopathy, podiatry or dentistry, and may not use roentgen rays or radium or use electricity for surgical purposes."); 32 M.R.S. § 3113–A(1) (2005) ("A physical therapist or physical therapist assistant may not make a medical diagnosis."); 32 M.R.S. § 3811(1) (2005) ("A psychological examiner may not provide psychotherapy services under any circumstances."); 32 M.R.S. § 4866 (2005) ("[N]o one but a veterinarian may diagnose, make prognoses, prescribe or initiate treatment or surgery or perform surgery."); 32 M.R.S. § 7053–A(1) (2005) ("A 'licensed master social worker, conditional' may not engage in private clinical practice . . . ."); 32 M.R.S. § 7053–A(4) (2005) ("A licensed social worker may not engage in the private practice of social work, diagnose mental illness and emotional disorders or provide psychotherapy."); 32 M.R.S. § 13855 (2005) ("Nothing in this chapter may be construed as permitting clinical professional counselors, professional counselors, marriage and family therapists, [or] pastoral counselors . . . to hold themselves out to the public as psychologists or psychological examiners . . . or to offer primarily or solely the services of psychological testing.").

ing the various categories of licensure are undefined: [5] "assist," "treat," "assess," and "principles of counseling." The differences between the powers of the various counselors turns on the definitions of these words.[6] Additionally, the magic words relied on by the Board and this Court, "diagnose" and "treat," are not defined in this

5. "Undefined terms within a statute are given their everyday meaning, and that meaning must be consistent with the overall statutory context and must be construed in the light of the subject matter, the purpose of the statute and the consequences of a particular interpretation." *State v. Ray*, 1999 ME 167, ¶ 7, 741 A.2d 455, 457 (quotation marks and citations omitted).

6. The statute defines the license categories as follows:

2. Clinical professional counselor. "Clinical professional counselor" means a professional counselor who renders or offers to render for a fee, monetary or otherwise, to individuals, families, groups, *organizations* or the general public, a counseling service involving the application of the principles and procedures of counseling to assess and treat intrapersonal and interpersonal problems and other dysfunctional behaviors and to assist in the overall development and adjustment of those served.
. . . .
6. Marital and family therapy services. "Marital and family therapy services" means the assessment and treatment of intrapersonal and interpersonal problems through the application of principles, methods and therapeutic techniques for the purpose of resolving emotional conflicts, modifying perceptions and behavior, enhancing communication and understanding among all family members, and preventing family and *individual crises.*
7. Marriage and family therapist. "Marriage and family therapist" means a person who renders or offers to render for a fee, monetary or otherwise, marital and family therapy services.
7–A. Pastoral counselor. "Pastoral counselor" means an individual who is trained and certified to provide for a fee, monetary or otherwise, pastoral counseling, which is ministry to individuals, families, couples, groups, organizations and the general public involving the application of principles and procedures of counseling to assess and treat intrapersonal and interpersonal problems and other dysfunctional behavior of a social and spiritual nature, and to assist in the overall development and healing process of those served.
. . . .
9. Professional counselor. "Professional counselor" means a person who, for a fee, monetary or otherwise, renders or offers to render to individuals, families, groups, organizations or the general public a service involving the application of principles and procedures of counseling to assist those served in achieving more effective personal, emotional, social, educational and vocational development and adjustment.

32 M.R.S. § 13851(2), (6), (7), (7–A), (9) (2005). The statute defines the "procedures of counseling" as follows:

8. Procedures of Counseling. "Procedures of counseling" means methods and techniques that include, but are not limited to, the following.
A. "Assessment" means selecting, administering and interpreting instruments *designed to assess personal, interpersonal* and group characteristics.
B. "Consulting" means the application of scientific principles and procedures in counseling to provide assistance in understanding and solving a current or potential problem that the client may have in relation to a 3rd party, be it an individual, a family, a group or an organization.
C. "Counseling" means assisting individuals, families or groups through the counseling relationship to develop understanding of intrapersonal and interpersonal problems, to define goals, to make decisions, to plan a course of action reflecting their needs, and to use information and community resources, as these procedures are related to personal, social, educational and vocational development.
D. "Referral" means the evaluation of information to identify needs or problems of the counselee and to determine the advisability of referral to other specialists, informing the counselee of that judgment, and communicating as requested or deemed appropriate with referral sources.

32 M.R.S. § 13851(8).

statute. Without definitions, it is impossible to guess with any degree of confidence how the regulator will differentiate, for example, between "assess and treat," and "assist." Cobb may have thought that by assessing and treating a client, she was assisting him. The Board, however, thought not.

[¶ 44] The Board argues that a LPC cannot "diagnose and treat" (undefined), but because a LPC can employ the "procedures of counseling," she can "assess" and "counsel." [7] *See* 32 M.R.S. § 13851(8)(A), (C) (2005). If the terms "diagnose and treat" are different than "assess" and "counsel," the Legislature or the Board should define these terms. [8]

[¶ 45] Of the four categories of licensure defined in the statute, only three, including the LPC, are entitled to apply the "principles and procedures of counseling" when rendering service. The marital and family therapist is not so authorized. Although the "procedures of counseling" are explained, the "principles of counseling" are not. Without a definition for "principles of counseling," it is impossible to ascertain the significance of not being licensed to apply them. Although, following an amendment to section 13858 in 1999, a marital and family therapist was deemed to have the ability to "diagnose and treat," she was still not granted the express authority to apply the undefined "principles" or the defined "procedures of counseling."

3. Other Provisions of the Statute Regulating LPCs, Board Rules, Reporting Forms, and Practices all Implicitly Authorize a LPC to Diagnose and Treat Mental Health Disorders

[¶ 46] Looking at the statutory scheme as a whole does not reveal that the Legislature intended to prohibit a LPC from diagnosing and treating mental health disorders. On the contrary, the authority of the LPC to diagnose and treat appears implicit in other provisions of the statutory scheme and the rules promulgated by the Board.

[¶ 47] Title 32 M.R.S. § 13853(13) (2005) provides that "[u]nder this chapter *all licensees . . .* are required to provide disclosure statements prior to *treatments . . . .* This disclosure statement must include . . . *the proposed course of treatment . . . .*" (emphasis added); *see also* 8 C.M.R. 02 514 008–2 § 1(C) (1998) (stating that the disclosure statement must contain "a general statement outlining a proposed course of *treatment,* including process of intake,

---

7. The Court says that although application of the procedures of counseling give LPCs, such as Cobb, the authority to perform "assessments," LPCs are not granted the same authority to "assess and treat intrapersonal and interpersonal problems and other dysfunctional behavior" that LCPCs are given. I see no difference in the authority granted because the statute does not distinguish between the "assessing" that a LCPC is authorized to perform, the "assessing" a marital and family therapist is authorized to perform, the "assessing" a pastoral counselor is authorized to perform, and the "assessing" that a LPC is authorized to perform. Further, the application of the procedures of counseling give LPCs the authority to counsel, which means "assisting individuals . . . to develop understanding of intrapersonal and interpersonal problems, to define goals, to make decisions, to plan a course of action reflecting their needs, and to use information and community resources, as these procedures are related to personal, social, educational and vocational development." 32 M.R.S. § 13851(8)(C). The statute provides no guidance as to the distinction between "counseling" intrapersonal and interpersonal problems and "treating" them. Thus, I fail to see how LPCs are not granted the same authority as the LCPCs to "assess and treat."

8. Compare 32 M.R.S. §§ 13851–13865 (2005) with 32 M.R.S. § 2102(2)(A) (2005), which defines the terms "diagnosis" and "treatment" within the context of nursing practice.

assessment, goal setting and *treatment plan*") (emphasis added). Implicit in the above section and rule is that LPCs are authorized to treat and are required to provide a disclosure statement prior to doing so.

[¶ 48] Section 13858 requires each of the four categories of counseling professionals to complete a specified amount of supervised experience in order to qualify for a license. The statute authorizes *any* licensed counseling professional to perform the supervision for any of the four categories of licensure. 32 M.R.S. § 13858(4) ("Supervision may be provided by a qualified and duly certified or licensed counseling professional, clinical social worker, psychologist or psychiatrist."). It is passing strange to suggest that a LPC is prohibited from diagnosing and treating mental health disorders when she is authorized to supervise others who are doing so.[9] Additionally, while Cobb was being supervised, supervisors were required to submit an affidavit to the Board to demonstrate that the supervisee had completed the supervised hours required for continued licensure. This form asked supervisors to comment on the applicant's: (1) performance in terms of *diagnosing and treating mental health disorders*; (2) personal character, ethical conduct, and competence; and (3) ability to function as a counselor. This form was used by supervisors for all four categories of licenses the Board issued. One can infer from the form that a LPC was authorized to diagnose and treat mental health disorders because the form required the LPC supervisor to comment on the supervisee's performance in "diagnosing and treating mental health disorders."

[¶ 49] The Board's rules contain further evidence inconsistent with the Board's prosecution of *Cobb*. While the Board was prosecuting Cobb, its rules established educational requirements for each licensure category. *See* 8 C.M.R. 02 514 002 (1998).[10] The educational requirements for graduate level course work for the licensed pastoral counselor included "at least three graduate semester hours ... [in] Assessment (Diagnosis and Treatment)." 8 C.M.R. 02 514 002–13 § 4(A)(1)(b) (1998). Obviously, while it was prosecuting Cobb, the Board's rules (at least) considered the terms "assessment" and "diagnosis and treatment" as synonymous.[11]

[¶ 50] Finally, the Board's Code of Ethics, 8 C.M.R. 02 514 008–3 § 3 (1998), which applies to all four license categories, provides that unprofessional conduct includes: "failing to recognize potential or actual harm to the client when *diagnosing, treating,* or advising clients on problems outside the recognized boundaries of the licensee's ... competence" and "failing to recognize the need for continued training, knowledge, personal awareness and relevant techniques necessary to *treat* clients from a culture different from the licensee or registrant's culture." 8 C.M.R. 02 514 008–4 § 3(B)(2), (4) (1998) (emphasis added). The language used in this section of

---

9. Perhaps in recognition of this incongruity, the Board, in July 2005, after it had sanctioned Cobb, promulgated rules to differentiate the supervision that a LPC may perform from the supervision that the other counseling professionals may perform. 8 C.M.R. 02 514 001–2 § 1(23) (2005).

10. The Board amended this rule in July 2005. The educational requirements for each licensure category are now located in chapters two through five of the Board's rules.

11. Perhaps acknowledging this inconsistency, the Board, after it had sanctioned Cobb, deleted the term "Assessment" from this course description when it amended this rule in July 2005. 8 C.M.R. 02 514 005–1 § 2(2)(D)(3) (2005) (requiring a licensed pastoral counselor to complete graduate hours in "Diagnosis and Treatment").

the Board's Code implies that LPCs have the authority to diagnose and treat. Accordingly, the LPC acts unprofessionally when she fails to "recognize potential or actual harm to the client when *diagnosing, treating,* or advising clients on problems outside the recognized boundaries of [her] competence." The clear implication of this language is that a LPC can diagnose and treat within the boundaries of her competence. It does not prohibit her from diagnosing and treating. Likewise, the LPC acts unprofessionally when she fails to recognize the need for additional training to treat someone from another culture. Thus, if the LPC obtains the necessary training to treat someone from another culture, she has the authority to do so.

### 4. Even the Board Acknowledges the Ambiguity

[¶ 51] The record reveals that there is confusion in the counseling world regarding the scope of a professional counselor's license. In the sanction phase of the hearing, the chairman of the Board stated:

> [I]t's clear to me that this whole area is unclear in many quarters. Certainly, in the insurance world and that's not the only unclarity [*sic*] the insurance world has about our work and the distinctions between the people and their skills, but also in the counseling world, itself.... [T]here is confusion out there ....

Another Board member added: "I think there is some disagreement among faculty as well as certain other professionals regarding the differences between the [licensed professional counselor and the licensed clinical professional counselor]."

### 5. No One in Cobb's Position Could Reasonably Infer That the Statute Would be Interpreted to Prohibit a LPC From Diagnosing and Treating Mental Health Disorders

[¶ 52] Cobb has diagnosed and treated patients for years, and the Board and Cobb's supervisors endorsed this conduct. At least two of the supervisor reports filed with the Board notified it that Cobb was diagnosing and treating after the 1999 amendment and prior to the conduct that sparked the complaint in this case. Both the Board and Cobb's supervisors had the opportunity to inform her that she was exceeding the scope of her license, but did not do so. The Board and her supervisors' inaction are indicative of the ambiguity present in the statute and reflected by the record.

### 6. The Board Failed to Warn the Relatively Few LPCs That in its View They Could No Longer Diagnose and Treat Mental Health Disorders

[¶ 53] Cobb received no warning that the Board was no longer going to authorize her conduct, until the Board brought this proceeding.

[¶ 54] Notwithstanding the Court's assertion to the contrary, the statute is plainly ambiguous. When statutes are ambiguous, we give deference to the Board's interpretation unless it is unreasonable, *Competitive Energy Servs. v. Pub. Utils. Comm'n,* 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046, or unless the statute is penal in nature, *State v. Chittim,* 2001 ME 125, ¶ 5, 775 A.2d 381, 383. Here, both exceptions apply. It is unreasonable and arbitrary because although Cobb has been legally diagnosing and treating mental health disorders for years and the statute does not explicitly prohibit her from doing so, the Board, without notice, found she was exceeding the scope of her license and fined her.

### B. Because Cobb Was Accused of a Civil Infraction Subjecting Her to the Imposition of a Fine, the Statute is Penal and Must be Construed Strictly Against the Board

[¶ 55] The statute governing counseling professionals provides that a violation of

the chapter constitutes a civil infraction subjecting the violator to the imposition of a fine. 32 M.R.S. § 13854(3) (2005). "It is a well recognized principle of statutory construction that penal statutes are to be construed strictly and that a criminal offense cannot be created by inference or implication[.]" *State v. Ashby,* 1999 ME 188, ¶ 6, 743 A.2d 1254, 1257 (quotation marks omitted). We have said that the purpose of statutes that provide for the revocation of a professional license "is to protect the public from improper conduct on the part of the [professional,]" *Me. Real Estate Comm'n v. Kelby,* 360 A.2d 528, 532 (Me.1976), and is not penal, *Me. Real Estate Comm'n v. Anderson,* 512 A.2d 351, 353 (Me.1986). Here, however, unlike the real estate broker statutes in *Kelby* and *Anderson,* section 13854 authorized, and the Commission imposed on Cobb, a fine. To that extent, the statute is penal and must be strictly construed. *See Chittim,* 2001 ME 125, ¶ 5, 775 A.2d at 383 (stating that a civil fine for a traffic infraction is penal); *see also Pike v. Civil Aeronautics Bd.,* 303 F.2d 353, 357–58 (8th Cir.1962) (stating that although revocation of a license is remedial rather than penal, the imposition of a civil penalty is certainly punitive for purposes of the rule that penal statutes are to be strictly construed); *Mansfield v. Ward,* 16 Me. 433, 435–36, 438 (1840) (holding that a statute is penal when recovery is not to compensate the plaintiff but to punish the offender and can be maintained without proof of actual injury). When we construe a statute strictly, all doubt must be resolved against the imposition of the penalty.

[¶ 56] Here, the Court's assessment notwithstanding, the record demonstrates great uncertainty as to the meaning of the statute. The Legislative history sheds no light on the Legislature's intent.[12] In light of this uncertainty, the interpretation of the statute should be resolved against the penalty. Because, at best, there is only an implication in the statute that a LPC may not "diagnose and treat," we should not countenance the creation of an offense and the imposition of a penalty by implication or inference. *See Ashby,* 1999 ME 188, ¶ 6, 743 A.2d at 1257.

C. Interpreting Section 13858 Against Cobb Violates Due Process

[¶ 57] "A law ... may ... be challenged on its face as unduly vague, in violation of due process." *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "Concepts of due process flowing from both the Fourteenth Amendment of the United States Constitution and Article I, § 6–A, of the Maine Constitution, require that those subject to sanction by law be given fair notice of the standard of conduct to which they can be held accountable." *Town of Baldwin v. Carter,* 2002 ME 52, ¶ 10, 794 A.2d 62, 67 (quotation marks omitted). A law is improperly vague "when its language either forbids or requires the doing of an act in terms so vague that people of common intelligence must guess at its meaning." *City of Portland v. Jacobsky,* 496 A.2d 646, 649 (Me. 1985). "Although the void-for-vagueness doctrine receives its commonest application in the criminal law context, '[T]he doctrine has [also] been applied in instanc-

---

12. The Summary Statement accompanying the 1999 amendment states only that "Part U amends the Board of Counseling Professionals Licensure laws to clarify that 'licensed clinical professional counselor,' 'licensed pastoral counselor' and 'licensed marriage and family therapist' are of equivalent clinical status." L.D.2042, Summary (119th Legis.1999). The statement does not say that the purpose of the amendment was to clarify that LPCs do not have the authority to diagnose and treat.

es where one must conform his conduct to a civil regulation.'" *Kelby,* 360 A.2d at 531 (quoting *Shapiro Bros. Shoe Co., Inc. v. Lewiston–Auburn Shoeworkers Protective Ass'n,* 320 A.2d 247, 253 (Me.1974)) (alteration in original).

[¶ 58] Here, the statute does not explicitly prohibit Cobb from diagnosing and treating, and other sections of the statute and the Board's rules and forms implicitly authorize her to do so. Thus, the statute is vague because Cobb was not given an opportunity to know what was prohibited and to adjust her conduct or status accordingly. Therefore, her due process rights were violated when she was prosecuted for practicing beyond the scope of her license.

[¶ 59] For the forgoing reasons, I would vacate.