STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, ss                                      CIVIL ACTION
                                                  DOCKET NO. AP-12-29
                                                  2AM - KEN - 4/9/2013


EVAN KLANE,
        Petitioner


v.                                    ORDER ON RULE 80C APPEAL


MARY MAYHEW,
        Commissioner, DHHS


        Before the Court is Petitioner Evan Klane's Petition for Review of a Final Agency Action

Pursuant to M.R. Civ. P. 80C and 5 M.R.S.A. §¶ 11001 *et seq.* The Final Administrative

Decision, dated May 25, 2012, denied Mr. Klane MaineCare Private Duty Nursing ("PDN")

services at Level V at home that he had been receiving since 2004. Petitioner seeks reversal of

the Decision, issued by the Department of Health and Human Services ("DHHS") on grounds

that DHHS committed an error of law by deciding that Mr. Klane is no longer eligible for PDN

services at Level V, and also because the Decision is at odds with the plain language of the

relevant MaineCare regulations.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

        The parties stipulate that the following facts are not in dispute. Evan Klane is twenty-one

years old, and has been receiving PDN services at Level V since 2004.[1] (R. Tab D at 3.)

Specifically, Registered Nurses assist Mr. Klane for 168 hours per week by maintaining and

---

[1] The PDN program is organized into five levels of care. *See* MBM, Ch. II, § 96.02. Each level of care has specific
eligibility requirements, and there is an associated financial cap. § 96.02-2; Appendix 2. Level V, the level for
which Mr. Klane has qualified since 2004, has the highest eligibility requirements, and the highest financial cap--
$20,682 per month.

1

assessing his tracheostomy tube and gastrostomy tube ("G-tube"), assessing and treating his frequent seizures, assisting him with his Activities of Daily Living ("ADLs"), and performing constant assessments of his physical condition. (R. Tab EK-5.) Mr. Klane also receives support from his parents to the extent they are capable. Mr. Klane's various diagnoses include: "cardiac dysrhythmia, osteoporosis, cerebral palsy, seizure disorder, depression, asthma, tachycardia, brachycardia, chronic dry eye, gastroesophageal reflux disease, constipation, neuromuscular spasticity, and history of bleeding ulcers." (R. Tab D at 4.) As a result, Mr. Klane requires twenty-four-hour nursing care and frequent nasopharyngeal suctioning. (R. Tab D at 4.) Mr. Klane is completely dependent on others for his care, receives nutrition, hydration, and medication through a G-tube, and breathes through a tracheostomy tube. (R. Tab D at 4.)

Mr. Klane had been receiving PDN services while he was under the age of twenty-one by way of DHHS approval.[2] However, when Mr. Klane or any individual reaches the age of twenty-one, the Department's agent, Goold Health Systems ("GHS") reassesses the patient to determine his or her needs going forward, and authorizes anew services based on the individual's medical eligibility. (R. Tab D at 4.) Mr. Klane was assessed by GHS on August 22, 2011 when his twenty-first birthday was approaching, and it was determined that he was no longer medically eligible for PDN services at Level V. (R. Tab D at 4.) Instead, it was found that Mr. Klane was eligible for twenty-eight hours of services per week under MaineCare's Adults with Disabilities waiver ("ADW waiver") provision. (R. Tab D at 4.)

When GHS informed Mr. Klane and his parents that he was found eligible for twenty-eight hours of nursing care through its Advisory Home & Community Benefits Assessment

---

[2] Petitioner explains that when a person is under twenty-one, the many agencies that come together to provide PDN care assess the prospective patient to determine whether he or she is medically eligible, decide what type of services the individual needs, and then submits a proposal to DHHS who then authorizes the necessary services. (R. Tab D at 3.)

2

notice on August 22, 2011, Mr. Klane, through his parents, filed a timely administrative appeal of the Department's determination on August 23, 2011. (R. Tab HO-6 at 1.) At a hearing held on November 22, 2011, the hearing officer addressed the issue of whether the GHS agent was correct when it denied Mr. Klane's eligibility for Level V PDN services under the MaineCare program.[3] (R. Tab HO-6 at 1.) After the November 22 hearing, but before reconvening on March 6, 2012, the parties agreed to submit a second issue for consideration—whether GHS was correct when it found Mr. Klane was eligible for twenty-eight hours of services per week under the ADW waiver program. (R. Tab D at 1.)

On April 12, 2012, the hearing officer issued a Recommended Decision finding that Mr. Klane requires frequent nasopharyngeal suctioning and twenty-four-hour nursing care; that he is completely dependent on others for the performance of all his ADLs; that he has a G-tube for nutrition, hydration, and medication; that he has a tracheostomy for breathing; and that he has an unstable seizure disorder. (R. Tab D at 4.) The hearing officer found that the GHS agent was correct when it determined Mr. Klane was not eligible for Level V PDN services under MaineCare, and found him eligible for twenty-eight hours of services per week under the ADW waiver. (R. Tab D at 4.)

On April 27, 2012, Mr. Klane filed written responses and exceptions to the Department decision, stating that the hearing officer erred in his application of MaineCare's PDN Level V eligibility requirements. (R. Tab E.) The Respondent, the DHHS Commissioner, issued a Final Decision on May 25, 2012, adopting the hearing officer's factual findings, and accepting the Recommended Decision.[4] (R. Tab F.) After Mr. Klane received the Final Decision on May 30, 2012, he filed a timely Petition for Review of Final Agency Action pursuant to Rule 80C and 5

---

[3] The determination of the hearing officer was adopted by the Department. (Pet.'s 80C Br. 3 n.6.)

[4] Finding that Mr. Klane is eligible for twenty-eight hours of services per week under the Home & Community Benefits of the Elderly and for Adults with Disabilities. (R. Tab F.)

3

M.R.S.A. § 11001 *et seq.* The Court has reviewed the record, the parties' written submissions, and considered their oral arguments presented on January 11, 2013, and issues the following order reversing the decision of the Commissioner.

## STANDARD OF REVIEW

The Superior Court may "[r]everse or modify the decision" of the administrative agency "if the administrative findings, inferences, conclusions or decisions are:
    (1) [i]n violation of constitutional or statutory provisions;
    (2) [i]n excess of the statutory authority of the agency;
    (3) [m]ade upon unlawful procedure;
    (4) [a]ffected by bias or error of law;
    (5) [u]nsupported by substantial evidence on the whole record; or
    (6) [a]rbitrary or capricious or characterized by abuse of discretion.

5 M.R.S.A. § 11007(4)(C). The standard of review on a Rule 80C appeal is "limited to whether the [governmental agency] abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record." *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 8, 695 A.2d 552.

Issues of statutory construction are questions of law, and are subject to *de novo* review. *See Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 7, 818 A.2d 1034; *In re Jeremiah Y.*, 2002 ME 135, ¶ 7, 804 A.2d 357; *Hallissey v. Sch. Admin. Dist. No. 77*, 2000 ME 143, ¶ 14, 755 A.2d 1068. When the meaning of a statute is unambiguous, the Court does "not defer to the agency's construction, but . . . interpret[s] the statute according to its plain language."[5] *Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 13, 896 A.2d 271. The Court, in interpreting statutes, "seeks to discern from the plain language the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable, or illogical." *Town of*

---

[5] Conversely, if a "statute is ambiguous, [the Court] defers to the agency's interpretation, and [the Court] affirms the agency's interpretation unless it is unreasonable. *Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 13, 896 A.2d 271.

4

*Eagle Lake*, 2003 ME 37, ¶ 7, 818 A.2d 1034 (internal citation omitted). Therefore, "[i]f the meaning of the language is plain, [the Court] must interpret the statute to mean exactly what it says." *In re Jeremiah Y.*, 2002 ME 135, ¶ 7, 804 A.2d 357. "When the dispute involves an agency's interpretation of a statute administered by it, the agency's interpretation, although not conclusive, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result." *Wood v. Superintendent of Ins.*, 638 A.2d 67, 70 (Me. 1994) (internal citation omitted).

*MaineCare Rules*

Per MaineCare's PDN program (Private Duty Nursing and Personal Care Services ("PCS")), individuals are eligible for different levels based on their medical needs and each of these levels has monthly monetary caps for the amount of PDN services they can receive. (R. Tab D-1 at 7; § 96.02-2.) Level V PDN services have the most stringent eligibility requirements and the highest monetary cap.[6] "A person meets the medical eligibility requirements for Level V if he or she requires either (1) or (2) below:

(1) Daily (7 days per week) nursing services and ventilator support for a person who is ventilator-dependent;

**Or**

(2) a. Daily (7 days per week) 24-hour nursing care for at least one for the following treatments and procedures: 96.02-4(B)(1)(a); (b); (c); (d); (h) or (j); required every 8 hours (or all 3 shifts), which are, or otherwise would be, performed by an RN or LPN;

**and**

b. Daily (7 days per week) nursing care for at least any 2 of the following professional nursing services: 96.02-4(B)(1)(a); (b); (c); (d); (h); or (j).

---

[6] The cap is $20,800.00. (R. Tab G at 5.)

(R. Tab D-1 at 13-14; § 96.02(E) (emphasis in original).) The treatment and procedures

provided for by § 96.02-4(B)(1) are:

(a) intraarterial, intravenous, intramuscular, or subcutaneous injection, or intravenous feeding, for treatment of unstable condition requiring medical or nursing intervention; other than daily insulin injections for an individual whose diabetes is under control;

(b) **nasogastric tube, gastrostomy, or jejunostomy feeding, for a new/recent (within past 30 days) or unstable condition;**

(c) **nasopharyngeal suctioning or tracheostomy care; however, care of a tracheostomy tube must be for a recent (within the last 30 days) or unstable condition;**

(d) treatment and/or application of dressing when the physician has prescribed irrigation, the application of prescribed medication, or sterile dressings of state III and IV decubitus ulcers, other widespread skin disorders (except psoriasis and eczema), or care of wounds, when the skills of a registered nurse are needed to provide safe and effective services (including, but not limited to, ulcers, 2nd or 3rd degree burns, open surgical sites, fistulas, tube sites, and tumor erosions);

(h) services to manage a comatose condition;

(j) **direct assistance from others is required for the safe management of an uncontrolled seizure disorder (i.e. grand mal)** . . . .

(R. Tab D-1 at 10-11; § 96.02(B)(1) (emphasis added).)

## DISCUSSION

The question specifically presented on appeal to the Superior Court is whether Mr. Klane

requires nursing services seven days a week for two of the services listed under Section 96.02-

4(E)(2)(b). (R. Tab E at 2). The Court concludes that the Department erred as a matter of law

when it denied Level V Private Duty Nursing services for Mr. Klane.

As a threshold matter, the parties agree that Mr. Klane meets the requirements for

6

§96.02(E)(2)(a) due to his need for nasopharyngeal suctioning per § 96.02(B)(1)(c). The parties further agree that Mr. Klane is eligible for nursing care seven days per week for at least one of the two professional nursing services listed for MBM, Ch. II, § 96.02(E)(2)(b) due to his need for direct assistance from others for the safe management of his uncontrolled seizure disorder per § 96.02(B)(1)(j). (R. Tab C at 6; Tab D, Rec. Dec. at 5.) However, Mr. Klane's position is that he also qualifies under § 96.02(B)(1)(b) because he has a gastrostomy tube for an "unstable condition." The Department disagrees as it posits that first, Mr. Klane's uncontrolled seizure disorder is not an unstable condition, and second, that the G-tube is not used to treat his seizure disorder, but is a means of receiving "nutrition, hydration and medication." (R. Tab D at 4.) The Department further posits that because Mr. Klane meets the requirements of § 96.02(E)(2)(a) due to his need for nasopharyngeal suctioning (cross referencing § 96.02(B)(1)(c)), he cannot double count the nasopharyngeal suctioning toward the two professional nursing services he needs under § 96.02(E)(2)(b).[7]

The Court disagrees as a matter of law with both of the Department's contentions, and finds that Mr. Klane does have an unstable medical condition (his uncontrolled seizure disorder), and that nothing in the regulations prohibits the sort of double counting the Department seeks to preclude.

The Department argues that the proper interpretation of MaineCare's eligibility requirements for PDN services at Level V is that because Mr. Klane's G-tube and tracheostomy tube were not recent or unstable, he did not need nursing seven days a week and was therefore

---

[7] The Department, in its Response Brief, argues that:

> Petitioner appears to assume that his trach should be counted in his favor toward eligibility both under subsection (a) and subsection (b). It cannot. Since Petitioner was assessed as meeting the criteria in subsection (a) because of his trach and nasopharyngeal suctioning to assist him with breathing, it cannot be duplicated as the basis for eligibility under subsection (b).

(Resp.'s Br. 6 n.6.) So, according to the Department's interpretation, Mr. Klane is not qualified for PDN Level V because he does not qualify under § 96.02(B)(1)(b) and (j)—he only qualifies under (j). (Resp.'s Br. 5-6.)

7

not eligible for PDN Level V. (R. Tab E at 3.) Mr. Klane concedes that neither the

tracheostomy tube nor the G-tube are recent, but argues that his *condition* is medically

unstable—it is his condition which the word "unstable" modifies, not the tracheostomy tube or

the G-tube, as found by the Department and hearing officer.[8] Based on the plain meaning of the

regulatory language, it is clear to the Court that the word "unstable" modifies Mr. Klane's

condition,[9] not the equipment that assists in treating his various and numerous medical

conditions.

Under the applicable rules governing the plain meaning of a given statute, Maine's courts

"first look to the plain meaning of the statute to determine . . . intent, and only if the statutory

language is ambiguous do [courts] go beyond the plain meaning and look at the legislative

history." *Oppenheim v. Hutchinson*, 2007 ME 73, ¶ 7, 926 A.2d 177. Additionally, the record of

the testimony heard at the administrative hearing on November 22, 2011 and March 6, 2012

establishes that Mr. Klane suffers from unstable medical conditions, and that he requires the use

of a tracheostomy tube and/or a G-tube for the treatment of those underlying unstable conditions.

At the hearing, the Department acknowledged that Mr. Klane has an uncontrolled seizure

disorder. Ms. Greenblatt, a registered nurse with Home Hope & Healing, a home health care

agency that conducts assessments among other things, testified that she believes an uncontrolled

seizure disorder is an unstable condition. (R. Tab G at 64.) She explained that "[a]nytime there

is a neurological assault on an individual their stability is challenged. In his case over the years,

---

[8] The Petitioner asserts, and the Court agrees, that under the basic rules of grammar, an adjective serves to modify a word it precedes; the adjectives "new/recent" and "unstable" do not refer to the G-tube or tracheostomy apparatuses, but instead refer to the type of condition—an unstable one—for which the G-tube or tracheostomy tube are necessary.

[9] Additionally, Mr. Klane argues that the term "condition" as construed by the Department is rendered "mere surplusage." (Pet'r's Br. 10.) Relying on *McGettigan v. Town of Freeport*, Mr. Klane asserts that since a term in a statute cannot be treated as mere surplasage if there is a reasonable construction supplying meaning and force available, only his interpretation of the regulation gives the term "condition" adequate meaning and force. *See* 2012 ME 28, ¶ 13, 39 A.2d 48.

8

it [has] also affected his respiratory status[,] so its just not a simple seizure per se it's . . . consistently affecting the decline of this [Mr. Klane]'s health." (R. Tab G at 64.) In short, Mr. Klane's seizure disorder creates instability with his underlying heart and respiratory conditions. Mr. Klane requires professional nursing care to suction his tracheostomy tube, monitor and assess his heart rate for excessive or inadequate pumping, assess and regulate his oxygen saturation levels, administer medications through his G-tube, and intervene as necessary. (R. Tab G.)

Put simply, Mr. Klane needs the tracheostomy tube in order to breathe. Mr. Klane's nurses suction his tracheostomy tube 114 times during an eight-hour period to allow for breathing, and Mr. Klane further requires nursing services to constantly assess and maintain his safety, as well as the tracheostomy tube's effectiveness. (R. Tab E at 1.) Mr. Klane suffers from daily intractable seizures, which often include grand mal seizures. During the assessment period --- the seven days prior to GHS' assessment of Mr. Klane --- his nurses recorded a total of twenty-six seizures. (R. Tab E at 1.)

The same procedures are required for Mr. Klane's G-tube, the tube through which he receives nutrition, hydration, and medication.

> . . . [T]he G-tube and tracheostomy tube were implanted at a very young age as a direct result of [Mr. Klane]'s significantly unstable condition. If [Mr. Klane] had a G-tube and/or a tracheostomy tube and did not have an unstable condition, [he] would not meet the regulatory criteria for PDN Level V. Because [Mr. Klane]'s medical needs are consistent with (B)(1)(b) or (c), he is eligible for PDN Level V.

(R. Tab E at 3.) This argument, presented by Mr. Klane's attorney in front of the Hearing Officer, summarizes the effects of the instability of his condition, and correctly applies the meaning of "unstable" as affecting his condition -- not the G-tube and/or the tracheostomy tube.

9

At oral arguments, as an apparent alternative to the Department's arguments against Mr. Klane's arguments that he qualified under § 96.02(B)(2)(b), the Department asserted that it does not allow Mr. Klane to count his need for nasopharyngeal suctioning toward both § 96.02(E)(2)(a) and (b). The Department refers to this as "double counting."

Before the hearing officer, Ms. Turner stated that Mr. Klane's seizure disorder does qualify him for seven days per week nursing care. Ms. Turner was asked: "since you already counted the suctioning for the first Section [(2)(a)] you can't count it twice?" (R. Tab G at 55.) Ms. Turner responded, "[n]o, you can't." (R. Tab G at 55.) This seems to be the entirety of the Department's position on this issue. When the Court at oral arguments asked whether the Department could point to any provision in the regulations prohibiting double counting, the Department was unable to do so, and further took the position that they did not need to justify the practice.

In support of its contention, the Department relies on *Fryeburg Health Care Ctr. v. Dep't of Human Servs.*, 1999 ME 122, 734 A.2d 1141, for the proposition that it is the Department's prerogative to interpret its regulations without having to promulgate rules to implement each and every policy declaration. The Department asserts that the Court should afford deference to the Department's "interpretation" of its own rules, and that this "interpretation" should not be set aside unless the rules plainly compel a contrary result. *See Fryeburg*, 1999 ME 122, ¶ 7, 734 A.2d 1141. The Court finds that the Department's reliance on *Fryeburg* is misplaced.

In *Fryeburg*, the Superior Court had "vacated a decision by the Commissioner of Human Services affirming the Department's decision not to reimburse Fryeburg for nursing facility services it provided to four patients whose medical eligibility reassessments it failed to have conducted by specific reclassification dates." *Id.* at ¶ 1. The Law Court, on appeal, agreed with

10

the Department that its interpretation of the Medicaid regulations was reasonable, and accordingly vacated the Superior Court's judgment. *See id.*

Fryeburg's argument on appeal was that the Department erred as a matter of law in disallowing the reimbursements because "it had not promulgated a formal rule pursuant to the rule making provisions of the Maine Administrative Procedures Act, 5 M.R.S.A. §§ 8052-54, explicitly explaining the consequences of failing to have timely reassessments conducted." *Id.* at ¶ 8. But, the Law Court found that an agency "is not required to use the formal rule making procedures every time it makes a decision interpreting an existing rule." *Id.* at ¶ 9.

The Department's reliance upon Fryeburg in the instant matter is misplaced. First, unlike here, the regulations at issue at issue in Fryeburg contained express provisions requiring timely assessments, and the record contained the very rules that the Department circulated in accordance with the formal rule making procedures. *See id.* at ¶¶ 9-10. Here, the Department is unable to point to anything in the record, or any other provision in regulations or statute that expressly prohibits the type of double counting it seeks to disallow.

Additionally, in *Fryeburg*, the Court noted that the provider was subject to ample prior notice about its need to obtain prior authorization before extending nursing facility services to a patient. *See id.* at ¶ 10. Here, there is nothing in the record to indicate that either Mr. Klane, or any other persons similarly situated, were made aware of any prohibition against "double counting." The Department's position fails to account for a regulatory scheme which provided notice in Fryeburg, but which seems absent in the present matter. The Court finds the Department's central position on "double counting" -- we do this because this is the way we do this – to be less than compelling.

The Department makes only one attempt to justify its interpretation. It seems to suggest that if double counting were permitted, there would be no need for two different standards, *i.e.*, § 96.02(E)(2)(a) and (b). However, the Department does not suggest what the substantive differences might be between the subparagraphs.

Again, Section 96.02(E) states the eligibility requirements for PDN Level V as follows:

1.      Daily (7 days per week) nursing services and ventilator support for a person who is ventilator-dependent;

**Or**

2.      a. Daily (7 days per week), 24-hour nursing care for at least one of the following treatments and procedures: 96.02-4(B)(1)(a); (b); (c); (d); (h) or (j); required every 8 hours (or all 3 shifts), which are, or otherwise would be, performed by an RN or LPN;

**and**

b. Daily (7 days per week) nursing care for at least any 2 of the following professional nursing services: 96.02-4(B)(1)(a); (b); (c); (d); (h); or (j).

While noting that they are different, the Department does not attempt to articulate why they are different or why any perceived differences would explain or justify its practice, even under a deferential standard of review.[10]  The Department has failed to point to any policy, any legislative intent, or any principle of statutory of regulatory interpretation that would permit it to require that when an individual requires services under (2)(a), that treatment/condition must be removed from consideration under (2)(b).

---

[10] The subparagraphs could be distinguished between conditions that require frequent intervention by qualified providers (96.02(E)(2)(a) ) and conditions that indicate the presence of more than one bodily system that require daily monitoring (96.02(E)(2)(b) ). As noted by Mr. Klane's counsel, his seizure disorder is not so unstable to require frequent interventions by skilled professionals, it also has profound and complex affects on more than one bodily system.

The entry will be: The decision of the Commissioner is **REVERSED.**

_____4/9/13_____                    _____
**DATE**                                **SUPERIOR COURT JUSTICE**

13

| Date Filed | 6/25/12 | Kennebec County | Docket No. AP-12-29 | F |
|---|---|---|---|---|

Action: <u>Petition for Review</u>
      80C

**J. Murphy**

Deborah Klane (OBO Evan Klane)     vs.     Mary C.Mayhew, Commissioner, DHHS

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Peter Rice, Esq.<br>Staci Converse, Esq.<br>PO Box 2007<br>Augusta, ME 04333-2007 | Janine Raquet, AAG<br>84 Harlow Street 2nd Floor<br>Bangor Maine 04401 |

Date of Entry

| | |
|---|---|
| 6/29/12 | Petition For Review Of Final Agency Action; Application To Proceed Without Payment Of Fees w/ Affidavit of Deborah Klane; Affidavit of Service, filed 6/25/12. s/Rice, Esq. |
| 6/29/12 | First Amended Petition For Review Of Final Agency Action, filed 6/25/12. s/Rice, Esq. |
| 6/29/12 | Amended Affidavit of Service, filed. s/Rice, Esq.<br>Certified Mail receipt addressed to Mary Mayhew, Commissioner, date of delivery 6/26/12, no signature, filed.<br>Certified Mail receipt addressed to William Schneider, AG, date of delivery 6/26/12, no signature, filed.<br>Certified Mail receipt addressed to Home Hope and Healing, date of delivery 6/26/12, signed by Tammy Dixon, filed. |
| 7/16/12 | Entry of Appearance, filed. s/Raquet, AAG |
| 7/17/12 | ORDER, Mills, J. (7/6/12)<br>- The filing fee is waived.<br>- The applicant is to attempt service by mail with acknowledgement. If such service is unsuccessful, service by deputy or by registered mail may be authorized on motion of the applicant, accompanied by an affidavit describing the attempted service by mail with acknowledgement, and after such hearing as may be necessary. Service by publication will not be approved except on specific motion.<br>Copy to Attty Rice |
| 7/18/12 | Certified Record, filed. s/Raquet, AAG |
| 8/9/12 | Notice and Briefing Schedule Issued<br>Copy to Atty. Rice and Janine Raquet, AAG |
| 9/21/12 | Petitioner's Brief For Review Of Final Agency Action, filed 9/1912/ s/Rice, Esq.<br>s/Converse, Esq. |
| 10/19/12 | Respondent's Unopposed Motion For Extension Of Time To File Her Brief, filed 10/18/12. s/Raquet, AAG |

10/23/12    ORDER, Murphy, J. (10/19/12)
            Respondent's Motion For Extension Of Time To File Her Brief is granted. Brief is
            due 10/29/12.
            Copy to Atty Rice and AAG Raquet

10/30/12    Respondent's Brief, filed 10/29/12. s/Raquet, AAG

11/15/12    Petitioner's Reply Brief, filed 11/13/12. s/Rice, Esq.

12/21/12    Oral argument scheduled for 1/11/13.
            List mailed to Atty Rice and AAG Raquet

1/11/13     Oral argument held.
            J. Murphy; Peter Rice, Esq. and Stavi Converse, Esq. for Petitioner; Janine Raquet,
            AAG for Respondent.
            Under advisement.

4/10/13     ORDER ON RULE 80C APPEAL, Murphy, J. (4/9/13)
            The decision of the Commissioner is REVERSED.
            Copy to Atty Rice and AAG Raquet
            Copy to repositories

4/10/13     Notice of removal of record/exhibits mailed to Atty Rice and AAG Raquet.