MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2016 ME 68
Docket:       BCD-15-287
Argued:       March 3, 2016
Decided:      May 10, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
              HUMPHREY, JJ.

NATHALIE TAFT ANDREWS et al.

v.

SHEEPSCOT ISLAND COMPANY

GORMAN, J.

[¶1]  After the shareholders of Sheepscot Island Company (SICO) approved a plan to convert from a for-profit corporation into a nonprofit corporation, several dissenting shareholders (collectively, the Tafts) sought declaratory and injunctive relief in the Business and Consumer Docket.[1]  The court (*Murphy, J.*) dismissed the Tafts' complaint pursuant to M.R. Civ. P. 12(b)(6), concluding that the Tafts could not make out a claim that SICO's conversion plan was invalid.  The Tafts appeal, arguing that the court incorrectly applied the law governing corporations and nonprofit conversions.  We disagree and affirm the judgment.

---

[1]  Because the conversion has not yet occurred, the use of "SICO" in this opinion refers exclusively to the for-profit corporation.  The seven plaintiffs are: Nathalie Taft Andrews, Frederick L. Taft, Eleanor Taft Ethridge, Alexander T. Taft III, John Christopher Lee Taft, Alexander T. Taft Jr., and Frances Pinney.

## I. BACKGROUND

[¶2]  The following facts, which we view as admitted for purposes of this appeal, are drawn from the Tafts' complaint and the documents attached to the complaint.  *See Nadeau v. Frydrych*, 2014 ME 154, ¶ 5, 108 A.3d 1254; *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶¶ 6-11, 843 A.2d 43.

[¶3]  SICO is a Maine corporation that was formed over one hundred years ago as a for-profit corporation.  It owns land and facilities on MacMahan Island, which is located near the mouth of the Sheepscot River and is part of the town of Georgetown.  There are forty cottages on MacMahan Island.  A majority of SICO's shares is held by shareholders who own cottages on the island, but there are numerous shareholders who do not own cottages on the island, including four of the plaintiffs in this case.  SICO issued only one class of shares, and its bylaws do not distinguish between cottage-owning shareholders and non-cottage-owning shareholders.

[¶4]  SICO first attempted to convert into a nonprofit corporation in 2005.  After a conversion plan was approved by a majority of shareholders, some dissenting shareholders, including three of the plaintiffs in this case, challenged the plan's validity.  The Superior Court (Sagadahoc County, *Warren, J.*) entered a summary judgment in their favor, concluding that SICO's conversion plan did not comply with 13-C M.R.S.A. § 931(3)(B) (2005), which required such plans to

"include . . . [t]he manner and basis of reclassifying" the corporation's shares.[2] *MacMahan Island Ass'n v. Andrews*, No. CV-05-61, 2006 WL 6872297 (Me. Super. Nov. 2, 2006). We affirmed the judgment on appeal. *MacMahan Island Ass'n v. Andrews*, 2008 ME 52, 943 A.2d 592.

[¶5] In July of 2014, SICO presented a second nonprofit conversion plan to its shareholders. The plan proposed the replacement of SICO's articles of incorporation with new articles, which would reclassify all SICO shares into two classes of memberships: "cottage memberships," available to cottage-owning shareholders, and "associate memberships," available to all shareholders who did not become cottage members. Both cottage and associate members would be entitled to vote on matters upon which any members could vote; however, each cottage member would be entitled to twelve votes, while the associate members would be entitled to no more than twelve votes collectively. All members, or their successors or assigns, would retain perpetual liquidation rights in proportion to the shares they held before the conversion. Both cottage and associate members would be entitled to receive or contract for SICO's services and both would retain the right to access and use community lands and facilities. Associate memberships

---

[2] Although the 2005 publication of the Maine Revised Statutes Annotated was in effect at the time, 13-C M.R.S. § 931(3)(B) has not changed. *See* 13-C M.R.S. § 931(3)(B) (2015).

4

would be non-transferable; as a consequence, each associate membership would terminate upon the associate member's death.

[¶6] At SICO's annual shareholders' meeting in August of 2014, the Tafts voted against the plan and preserved their rights as dissenters, but the majority of the shareholders voted to approve the plan.

[¶7] On December 23, 2014, the Tafts filed a complaint against SICO claiming that the nonprofit conversion plan should be invalidated because it "fails to reclassify all shares of the corporation equally" in violation of both 13-C M.R.S. § 601(1) (2015) and statutes governing nonprofit conversion, specifically, 13-C M.R.S. § 931 (2015). They attached various documents related to the proposed conversion, including the conversion plan itself. The Tafts sought a declaratory judgment invalidating the plan and a permanent injunction barring its implementation. On SICO's motion, the trial court (Business and Consumer Docket, *Murphy, J.*) dismissed the Tafts' complaint with prejudice pursuant to M.R. Civ. P. 12(b)(6). The court reasoned that SICO's plan complied with the plain terms of the nonprofit conversion statute and that there is no requirement that shares be reclassified into "equal" memberships in the resulting nonprofit entity. This appeal followed.

## II.  DISCUSSION

### A.    Standards of Review

[¶8]  When we review a trial court's grant of a motion to dismiss for failure to state a claim upon which relief can be granted, "we view the facts alleged in the complaint as if they were admitted." *Frydrych*, 2014 ME 154, ¶ 5, 108 A.3d 1254 (quotation marks omitted).  We also consider "documents referred to in the complaint . . . when the authenticity of such documents is not challenged." *Moody*, 2004 ME 20, ¶ 11, 843 A.2d 43.  "We review the legal sufficiency of the complaint de novo and view the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Frydrych*, 2014 ME 154, ¶ 5, 108 A.3d 1254 (quotation marks omitted).

[¶9]  To determine the legal sufficiency of the Tafts' complaint, we must consider relevant provisions of the Maine Business Corporation Act, 13-C M.R.S. §§ 101-1702 (2015), including the provisions that specifically govern nonprofit conversion, 13-C M.R.S. §§ 931-936.  Interpreting statutes de novo, we first "examine the plain meaning of the language to avoid absurd, illogical or inconsistent results." *Wong v. Hawk*, 2012 ME 125, ¶ 8, 55 A.3d 425 (quotation marks omitted).  Because the statutes at issue in this case are not ambiguous, we do

6

not look beyond their plain language.  *See, e.g.*, *Strout v. Cent. Me. Med. Ctr.*, 2014 ME 77, ¶ 10, 94 A.3d 786.

B.     Compliance with the Nonprofit Conversion Statute

[¶10]  Pursuant to 13-C M.R.S. § 931(1), "[a] domestic business corporation may become a domestic nonprofit corporation pursuant to a plan of nonprofit conversion."   Section 931(3) sets forth the elements that must be included in a domestic nonprofit conversion plan:

> **A.**  The terms and conditions of the conversion;
>
> **B.**  The manner and basis of reclassifying the shares of the corporation following its conversion into memberships, if any, or securities, obligations, rights to acquire memberships or securities, cash, other property or any combination thereof; [and]
>
> **C.**   Any desired amendments to the articles of incorporation of the corporation following its conversion.

[¶11]  Section 931(3) is broad, but its language is not ambiguous.  It contains no express limitations on the actual manner of reclassification or the basis on which shares may be reclassified, providing only that the plan "must include . . . [t]he manner and basis of reclassifying the shares of the corporation following its conversion."   13-C M.R.S. § 931(3)(B).   Accordingly, when a business corporation's conversion into a nonprofit corporation becomes effective, "[t]he shares of the corporation are reclassified into memberships, securities, obligations, rights to acquire memberships or securities or into cash or other property *in*

*accordance with the plan of conversion*." 13-C M.R.S. § 935(1)(E) (emphasis added).

[¶12] "[W]e do not read exceptions, limitations, or conditions into an otherwise clear and unambiguous statute," *Adoption of M.A.*, 2007 ME 123, ¶ 9, 930 A.2d 1088, and we agree with the official comment to the applicable section of the Model Business Corporation Act, which confirms that the nonprofit conversion statute "imposes virtually no restrictions or limitations on the terms and conditions of a nonprofit conversion," Model Bus. Corp. Act § 9.30 cmt. 2 (Am. Bar Ass'n 2008).[3] SICO's conversion plan tracks the requirements of the statute, describing in detail the terms and conditions of the conversion and the manner and basis of reclassifying the SICO shares, and it includes new articles of incorporation to replace SICO's articles of incorporation when the articles of nonprofit conversion become effective. We therefore conclude that SICO's conversion plan complies with the plain terms of section 931(3).

C.    Applicability of 13-C M.R.S. § 601(1)

[¶13] The Tafts further argue, however, that SICO's conversion plan is unlawful because it does not comply with 13-C M.R.S. § 601(1), a provision of the

---

[3]   The Legislature modeled the Maine Business Corporation Act, 13-C §§ 101-1702 (2015), after the Model Business Corporation Act. *See* P.L. 2001, ch. 640, §§ A-1 to B-7 (effective July 1, 2003). Indeed, "Maine's [nonprofit conversion] statute is nearly identical to section 9.30" of the Model Business Corporation Act. Model Bus. Corp. Act § 9.30 annot. (Am. Bar Ass'n 2008).

8

Maine Business Corporation Act found outside the nonprofit conversion statute. Section 601(1) provides, in relevant part: "Except to the extent varied as permitted by this section, all *shares* of a class or series must have terms, including preferences, rights and limitations that are identical with those of other shares of the same class or series." (Emphasis added.) The Tafts contend that SICO's nonprofit conversion plan runs afoul of section 601(1) because it proposes the reclassification of SICO's shares into two different types of memberships with disparate rights.

[¶14] This contention is unpersuasive for several reasons. First, at all times, SICO's corporate share structure has complied with section 601(1). At the moment the conversion occurs, SICO ceases to exist but, until that time, all of its shares have been and are identical.

[¶15] By law, articles of nonprofit conversion become effective on the date and at the time of filing with the Secretary of State, unless a later effective date is specified in the document. 13-C M.R.S. §§ 125, 933(3). Pursuant to SICO's conversion plan, its new articles of incorporation, which would implement the plan's reclassification of SICO's shares into cottage and associate memberships, would take effect ten days after the filing of the articles of nonprofit conversion. *See* 13-C M.R.S. § 931(3)(B) (requiring a conversion plan to include "[t]he manner and basis of reclassifying the shares of the corporation *following* its conversion"

(emphasis added)). Until the conversion plan becomes effective, only one class of shares exists. Thus, SICO's shareholders approved a plan that proposed disparate types of *memberships* in a nonprofit entity. Approval of the plan, however, did not create disparate classes of *shares*.

[¶16] Second, neither section 601 nor the nonprofit conversion statute contains any indication that section 601(1) applies once a conversion takes effect. Section 601 places limitations on a "corporation's" share structure, 13-C M.R.S. § 601(1)-(4), and "[c]orporation . . . means a corporation for profit or with shares," 13-C M.R.S. § 102(4). Because nonprofit corporations do "not have or issue shares of stock," 13-B M.R.S. § 407 (2015), section 601 can only apply to for-profit corporations. Nothing in section 601 or the nonprofit conversion statute—or in any other portion of the Maine Business Corporation Act—imposes a similar limitation on memberships in a nonprofit corporation or on the nonprofit conversion plan itself.[4]

---

[4] For the same reasons, we are not persuaded by the Tafts' arguments that (1) section 601(1) should apply to memberships in a nonprofit corporation because conversions are "fundamentally similar" to corporate mergers, or (2) that, for SICO's plan to be valid, each "separate class[] of shares" would have to have voted in favor of the plan. If a corporation has multiple classes of shares, "approval of the plan of nonprofit conversion requires the approval of each separate voting group by a majority of the votes entitled to be cast on the nonprofit conversion by that voting group." 13-C M.R.S. § 932(6). Because SICO has only one class of shares, no "separate classes of shares" exist, and section 932(6) does not apply. A majority of SICO's shareholders voted to approve the conversion plan pursuant to 13-C M.R.S. § 932(5), which "requires the approval of the shareholders by a majority of all the votes entitled to be cast on the plan by the shareholders."

[¶17]  Third, even if, as the Tafts argue, section 601(1) continues to apply to a nonprofit corporation as a "general principle" of Maine corporate law, SICO's proposed nonprofit membership arrangement would comply with the statute.  That is because, although the plan's new articles of incorporation do distinguish between two membership "classes," they do not contemplate any differences in terms among members of the same class.

[¶18]  Finally, section 601 itself contains an exception to the rule of equal treatment, stating that "[a]ny of the terms of shares may vary among holders of the same class or series of shares as long as the variations are expressly set forth in the articles of incorporation."  13-C M.R.S. § 601(6).  The new articles of incorporation, which would implement the conversion plan's provisions, expressly set forth the terms applying to all members.

[¶19]  With this conversion plan, which provides all current shareholders a choice to become members of the new nonprofit corporation or to exercise their appraisal rights and receive the fair value of their shares, SICO has cured the deficiency we saw in SICO's first nonprofit conversion plan.  In *Andrews*, we described the terms of the first conversion plan as follows:

> Pursuant to the plan, shareholders who do not own cottages would not have any right to share in any liquidation, sale, or other realization of the assets of the corporation.  Non-cottage owners would lose any equity interest in [SICO's] assets.  All shares of [SICO] would be deemed surrendered, but the owners of each of the forty cottages on

MacMahan Island would be entitled to one cottage membership in the new [nonprofit entity].

2008 ME 52, ¶ 8, 943 A.2d 592. On those facts, we held that the trial court did not err in concluding that the first plan was invalid "[b]ecause the plan for nonprofit conversion *did not include any provision for the reclassification of the shares* of the for-profit corporation following conversion, as required by" section 931(3)(B). *Id.* ¶ 2 (emphasis added). In contrast, the conversion plan at issue in this case does include a provision for the reclassification of the for-profit corporation's shares; also, all persons who held shares in the for-profit corporation—including those who do not own cottages on the island—retain perpetual liquidation rights, and thereby retain their proportional equity interest in the corporation's assets.

D.      Control of Corporate Assets

[¶20] We recognize that, based on our holding today, SICO shareholders who are eligible only to become associate members—and who choose to do so—will have little control over the management of the assets in which they retain perpetual liquidation rights. Such a result occurs whenever a corporation's board of directors proposes a fundamental change in corporate status and the shareholders vote to approve the proposed change by a less-than-unanimous vote. In those circumstances, dissenting shareholders are presented with a choice: they may leave the corporation, exercise statutory appraisal rights, and thereby receive

12

the fair monetary value of the shares they hold in the corporation, *see* 13-C M.R.S. §§ 1301-1341 (2015), or they may stay in the corporation and acquiesce to the will of the majority.

[¶21] Sections 1301 to 1341 of the Maine Business Corporation Act govern appraisal rights. In the event of various corporate actions including conversion to nonprofit status, "[a] shareholder is entitled to appraisal rights and to obtain payment of the fair value of that shareholder's shares." 13-C M.R.S. § 1302. "Fair value" is statutorily defined as follows:

> **4. Fair value.** "Fair value" means the value of a corporation's shares determined:
>
> > **A.** Immediately before the effectuation of the corporate action to which a shareholder objects;
> >
> > **B.** Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and
> >
> > **C.** Without discounting for lack of marketability or minority status except, if appropriate, for amendments to the corporation's articles of incorporation pursuant to section 1302, subsection 5.

13-C M.R.S. § 1301(4). If the Tafts were to exercise appraisal rights, with the value of their shares being determined by a court if disputed, *see* 13-C M.R.S. §§ 1302, 1327, 1331, any property rights associated with their shares, e.g., the right

to use docks, community buildings, etc., will have to be considered in determining the value of the shares.[5]

[¶22]    We described the development of the appraisal remedy in *In re Valuation of Common Stock of McLoon Oil Co.*:

> The traditional rule through much of the 19th century was that any corporate transaction that changed the rights of common shareholders required unanimous consent.  The appraisal remedy for dissenting shareholders evolved as it became clear that unanimous consent was inconsistent with the growth and development of large business enterprises.  By the bargain struck in enacting an appraisal statute, the shareholder who disapproves of a proposed merger or other major corporate change gives up his right of veto in exchange for the right to be bought out—not at market value, but at "fair value."

565 A.2d 997, 1004 (Me. 1989).   Other courts have noted the shift toward a majority rule approach and concomitant proliferation of appraisal rights statutes. *See Stringer v. Car Data Sys., Inc.*, 841 P.2d 1183, 1184 (Or. 1992) ("Legislatures, courts, and commentators found that the right of a single shareholder to veto business transactions trammeled the concept of corporate democracy. . . . [The appraisal] remedy is designed to provide statutory protection to those

---

[5]    Concerning "customary and current valuation concepts," the official comment to the applicable section of the Model Business Corporation Act acknowledges that "different transactions and different contexts may warrant different valuation methodologies," and provides, "For example, if the corporation's assets include undeveloped real estate that is located in a prime commercial area, the court should consider the value that would be attributed to the real estate as commercial development property in a comparable transaction."  Model Bus. Corp. Act § 13.01 cmt. 2 (Am. Bar Ass'n 2008).  The method of determining the "value" of the shares must necessarily include not just "market value," but also "all other elements that may be legitimately considered." *Chicago Corp. v. Munds*, 172 A. 452, 453 (Del. Ch. 1934).

minority shareholders who do not concur with the decision of the majority shareholders."); *Yanow v. Teal Indus., Inc.*, 422 A.2d 311, 316 n.5 (Conn. 1979) ("[T]he view that majoritarian decision-making must take precedence over the dissent of a minority shareholder . . . reflect[s] a social policy of preferring corporate democracy and flexibility over the common-law notion of vested shareholder rights."); *Schenley Indus., Inc. v. Curtis*, 152 A.2d 300, 301 (Del. 1959) ("[I]t became necessary to protect the [shareholders'] contractual rights . . . by providing for the appraisement of their stock and the payment to them of the full value thereof in money."); *Chicago Corp. v. Munds*, 172 A. 452, 455 (Del Ch. 1934) ("In compensation for the lost right[,] a provision was written into the modern statutes giving the dissenting stockholder the option completely to retire from the enterprise and receive the value of his stock in money.").

[¶23] Here, the Tafts may choose to demand the fair monetary value of their property interest pursuant to the appraisal rights statutes, or proceed on terms known to them: little control over the management of the corporation's assets, but a right to receive their proportional share of those assets in the event of future dissolution and liquidation. The nonprofit conversion statute expressly contemplates this result, stating that when a conversion becomes effective, "the shareholders are entitled only to the rights provided in the plan of nonprofit conversion or to any [appraisal] rights they may have." 13-C M.R.S. § 935(1)(E).

[¶24] This appraisal rights "compromise," Model Bus. Corp. Act § 13.01 cmt. 1 (Am. Bar Ass'n 2008), means that in the face of a fundamental corporate change, dissenting shareholders may choose to preserve the property rights they hold in the corporation's assets. Absent noncompliance with the governing statutes, fraud, or the like, however, they do not possess a statutory or other right to veto a fundamental corporate change that has been approved by a majority of the shareholders.[6] *See* 13-C M.R.S. § 1341; Zimpritch, *Maine Corporation Law & Practice* §§ 13.1 at 506-07, 13.7 at 525-26 (3d ed. 2015) (discussing the scope of section 1341's limitation on remedies other than appraisal).

## III. CONCLUSION

[¶25] Neither section 601(1) nor the nonprofit conversion statute prohibits a business corporation's nonprofit conversion plan from reclassifying the

---

[6] In 1862, the Massachusetts Supreme Judicial Court explained,

> [E]very person who becomes a member of a corporation aggregate by purchasing and holding shares agrees by necessary implication that he will be bound by all acts and proceedings . . . which shall be adopted or sanctioned by a vote of the majority of the corporation, duly taken and ascertained according to law. . . . A holder of shares in an incorporated body, so far as his individual rights and interests may be involved in the doings of the corporation, acting within the legitimate sphere of its corporate power, has no other legal control over them than that which he can exercise by his single vote in the meetings of the company. To this extent, he has parted with his personal right or privilege to regulate the disposition of that portion of his property which he has invested in the capital stock of the corporation, and surrendered it to the will of a majority of his fellow corporators.

*Durfee v. Old Colony & Fall River R.R. Co.*, 87 Mass. (5 Allen) 230, 242 (Mass. 1862). *See also Inhabitants of Waldoborough v. Knox & Lincoln R.R. Co.*, 84 Me. 469, 471, 24 A. 942 (1892) ("When there are differences of opinion, aggregate bodies . . . must act by majorities, or they can not act at all. It is true that this doctrine subjects minorities to the will of majorities; but it is equally true that the contrary doctrine subjects majorities to the will of minorities . . . .").

corporation's shares into membership classes with disparate rights. Because the Tafts have not alleged facts that, viewed as admitted, make out a claim that SICO's conversion plan is invalid or that they are entitled to declaratory or injunctive relief, the trial court correctly dismissed their complaint pursuant to M.R. Civ. P. 12(b)(6).

The entry is:

Judgment affirmed.

---

**On the briefs:**

Albert G. Ayre, Esq., and John A. Turcotte, Esq., Ainsworth, Thelin & Raftice, P.A., South Portland, for appellants Nathalie Taft Andrews et al.

Paul McDonald, Esq., and Eben M. Albert, Esq., Bernstein Shur, Portland, for appellee Sheepscot Island Company

**At oral argument:**

John A. Turcotte, Esq., for appellants Nathalie Taft Andrews et al.

Paul McDonald, Esq., for appellee Sheepscot Island Company