MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2020 ME 27
Docket:       Wal-19-121
Argued:       October 10, 2019
Decided:      March 3, 2020

Panel:        SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HUMPHREY, JJ.*

ERIK WUORI

v.

TRAVIS OTIS

HUMPHREY, J.

[¶1]  Travis Otis appeals from a judgment of the District Court (Belfast, *Mathews, J.*) ordering the turnover and sale of his boat to satisfy a money judgment against him in favor of Erik Wuori.  *See* 14 M.R.S. § 3131 (2018).  In this appeal, we are asked to determine whether the court erred in concluding that "First Team"—a thirty-six-foot boat owned by Otis—was not used "primarily for commercial fishing" and, therefore, was not exempt from attachment and execution.  *See* 14 M.R.S. § 4422(9) (2018).  We vacate the judgment.

---

* Although Justices Alexander and Hjelm participated in the appeal, they retired before this opinion was certified.

## I. BACKGROUND

[¶2]  The relevant procedural record of this case begins on December 10, 2018, when a judgment was entered in favor of Wuori and against Otis in the amount of $60,000.  On January 31, 2019, Wuori served Otis with a disclosure subpoena to appear before the trial court to determine Otis's ability to satisfy the judgment.  *See* 14 M.R.S. § 3122 (2018). The court held a disclosure hearing on February 15, 2019, at which Otis appeared and testified.  *See* 14 M.R.S. § 3125(1) (2018).  On March 13, 2019, the court entered an order of turnover and sale of Otis's boat in favor of Wuori, *see* 14 M.R.S. § 3131, after finding the following facts.

[¶3]  Otis owns a thirty-six-foot boat named "First Team" that is worth $55,000.  Otis has not used his boat to catch and sell lobsters since 2014. Instead, he uses the boat to catch lobsters for the Maine Department of Marine Resources (the Department) to collect data on juvenile lobsters.[1]

---

[1]  The Maine Department of Marine Resources conducts a "ventless trap survey" annually from June to August, during which the Department hires local lobstermen for the purpose of collecting data about the State's juvenile lobster population.  *See* Me. Dept. of Marine Resources website/Research/Ventless Trap Survey (last visited Feb. 28, 2020).  In describing the work he does with the Department as part of the ventless trap survey, Otis testified that "we . . . take everything down to the harbor, we load it on the vessel, we load the vessel with all the bait, all the buoys that we need; we get the data points from the State of Maine, we plot the course, and then we go out and we deploy that gear.  A few days later, we come back, we cycle through, we pull all the gear, we re-bait all the gear, we take all the things that we catch in the traps, [and] we . . . data catalog those."

[¶4]  The court concluded that the boat was not exempt from attachment and execution within the meaning of 14 M.R.S. § 4422(9) because Otis "does not harvest the lobster he catches but returns them to the ocean"[2] and thus, he "does not use the boat 'primarily for commercial fishing.'"[3]  The court ordered that Otis turn over the boat to Wuori to be sold in order to satisfy the $60,000 money judgment previously entered in Wuori's favor.  *See* 14 M.R.S. § 3131.

## II.  DISCUSSION

[¶5]  The sole issue we address in this appeal is whether the court erred in concluding, pursuant to 14 M.R.S. § 4422(9), that Otis's use of his boat in his work for the Department does not constitute "commercial fishing."[4]  Otis contends that, because he is a licensed lobsterman and is compensated for using his boat to provide a service to the Department by hauling and catching lobsters for its data collection program, he is engaged in "commercial fishing."

---

[2]  The word "harvest" used by the court does not appear in the exempt property statute, 14 M.R.S. § 4422 (2018); however, it is defined as "to gather in (a crop, etc.)" or "to catch, shoot, trap, etc. (fish or game), usually in an intensive, systemic way, as for commercial purposes," *Harvest*, Webster's New World College Dictionary (5th ed. 2016), and as "[to] catch or kill (animals) for human consumption or use," *Harvest*, New Oxford American Dictionary (3d ed. 2010).

[3]  The court also concluded that Otis "failed to carry his burden of proof" in regards to the exemption.  *See Steelstone Indus., Inc. v. McCrum*, 2001 ME 171, ¶¶ 8-10, 785 A.2d 1256.

[4]  The parties did not raise before the trial court or on appeal the issue of whether Otis's work for the Department was the "primary" use of his boat.  Rather, the focus of their dispute is whether Otis's use of the boat constituted "commercial fishing" within the meaning of the exemption statute, and we limit our discussion to that issue.  *See* 14 M.R.S. § 4422(9).

4

He argues that the statute does not require him to sell the lobsters he catches for the use of his boat to be a "commercial" activity.

A.    Standard of Review

[¶6]  We review the "court's interpretation and application of a statute de novo, looking first to the plain meaning of the statutory language to give effect to the Legislature's intent." *Teele v. West-Harper*, 2017 ME 196, ¶ 10, 170 A.3d 803.  We interpret the plain language "by taking into account the subject matter and purposes of the statute, and the consequences of a particular interpretation," *Ford Motor Co. v. Darling's*, 2016 ME 171, ¶ 24, 151 A.3d 507 (quotation marks omitted), and give "technical or trade expressions . . . a meaning understood by the trade or profession," *Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 12, 896 A.2d 271; *see* 1 M.R.S. § 72(3) (2018). In doing so, we seek "to avoid absurd, illogical or inconsistent results." *Andrews v. Sheepscot Island Co.*, 2016 ME 68, ¶ 9, 138 A.3d 1197.  We also "consider the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Urrutia v. Interstate Brands Int'l*, 2018 ME 24, ¶ 12, 179 A.3d 312 (quotation marks omitted).

[¶7]  If the plain language of a statute is ambiguous, only then "will we look beyond that language to examine other indicia of legislative intent, such as legislative history." *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 14, 157 A.3d 223.  "Statutory language is considered ambiguous if it is reasonably susceptible to different interpretations." *Id.* (quotation marks omitted).

B.     The Exemption Statute—14 M.R.S. § 4422(9)

[¶8]  As a means of allowing judgment creditors to enforce money judgments, the Legislature established a process for obtaining orders requiring judgment debtors to turn over their property. *See* 14 M.R.S. §§ 3120-38 (2018). However, as a matter of public policy, specific property is exempt from this process.  *See* 14 M.R.S. § 4422.  These exemptions from attachment and execution have existed since the earliest days of Maine's statehood.  *See, e.g.*, *Martin v. Buswell*, 108 Me. 263, 264-65, 80 A. 828 (1911) (stating that "at a very early day" it was evident to the Legislature that it "was against sound public policy" to take tools from a debtor that could be used by the debtor to pay a debt); R.S. ch. 114, § 38 (1841) (listing property exempt from attachment and execution).  As early as 1835, the Legislature determined that a debtor's interest in a boat "usually employed in the fishing business" would be exempt

6

from attachment, *see* P.L. 1835, ch. 172 (codified as R.S. ch. 114, § 38 (1841)),

and this exemption has remained in existence in various forms ever since.[5]

[¶9] Relevant to this appeal, the statute exempts from attachment and

execution "[t]he debtor's interest in one boat, not exceeding 46 feet in length,

used by the debtor primarily for commercial fishing." 14 M.R.S. § 4422(9). It is

the debtor's burden to establish the elements necessary to qualify for the

exemption—in particular that the boat is used for "commercial fishing." *See*

*Steelstone Indus., Inc. v. McCrum*, 2001 ME 171, ¶¶ 8-10, 785 A.2d 1256; *Daniels*

*v. Daniels*, 593 A.2d 658, 660 (Me. 1991). However, because neither

"commercial" nor "fishing" is defined in the statutes governing money

judgments or exempt property, *see* 14 M.R.S. § 3121 (2018) (providing

definitions for the enforcement of money judgments); 14 M.R.S. § 4421 (2018)

(providing definitions for property exempt from attachment), we begin our

review by analyzing the plain meaning of those terms.

---

[5] *See* 14 M.R.S.A. § 4401 (1964), repealed and replaced by P.L. 1981, ch. 431 (effective Sept. 18, 1981) (codified at 14 M.R.S. § 4422 (2018)); R.S. ch. 112, § 67 (1954); R.S. ch. 99, § 67 (1944); R.S. ch. 95, § 67 (1930); R.S. ch. 86, § 64 (1916); R.S. ch. 83, § 64 (1903); R.S. ch. 81, § 62 (1883); R.S. ch. 81, § 59 (1871); R.S. ch. 81, § 36 (1857).

1.      "Commercial Fishing"

[¶10]  On its face, the statute exempts from attachment and execution a boat used primarily for "commercial fishing."  14 M.R.S. § 4422(9).  The word "fishing" is commonly understood as the act of catching fish[6] and, because we give "technical or trade expressions . . . a meaning understood by the trade or profession," *Cobb,* 2006 ME 48, ¶ 12, 896 A.2d 271, it also encompasses the act of catching other marine organisms like lobsters and crabs.  *See, e.g.*, 12 M.R.S. § 6421 (2018) (including the requirements to obtain a crab or lobster "fishing" license); 13-188 C.M.R. ch. 25 (effective August 21, 2018) (discussing "lobster fishing" pursuant to the Department of Marine Resources' lobster and crab regulations).  As such, the word "fishing" is not ambiguous.

[¶11]  The meaning of "commercial," however, can be understood in different ways.  "Commercial" may mean "concerned with or engaged in commerce," *Commercial*, New Oxford American Dictionary (3d ed. 2010), or "of or relating to commerce," *Commercial*, American Heritage Dictionary of the English Language (5th ed. 2016).  "Commerce," in turn, is defined as "the buying and selling of goods, especially on a large scale, as between cities or nations."

---

[6]  Dictionaries define the term "fishing" as "the activity of catching fish, either for food or as a sport," *Fishing*, New Oxford American Dictionary (3d ed. 2010), and "the catching of fish for sport or as a living," *Fishing*, Webster's New World College Dictionary (5th ed. 2016).

8

*Commerce*, American Heritage Dictionary of the English Language (5th ed. 2016)*.*  Alternatively, "commercial" may be understood as "making or intended to make a profit," *Commercial*, New Oxford American Dictionary (3d ed. 2010), or "having profit as a chief aim," *Commercial*, American Heritage Dictionary of the English Language (5th ed. 2016).

[¶12]  Because the meaning of "commercial" is "reasonably susceptible to different interpretations," *Scamman*, 2017 ME 41, ¶ 14, 157 A.3d 223, the term is ambiguous.  Therefore, we must "examine other indicia of legislative intent, such as legislative history," *id.*, and determine whether the Legislature intended to define "commercial" as relating to "the buying or selling of goods, especially on a large scale," *Commerce*, American Heritage Dictionary of the English Language (5th ed. 2016), or as "having profit as a chief aim," *Commercial*, American Heritage Dictionary of the English Language (5th ed. 2016).

2.    Statutory History

[¶13]  In 1981, the Legislature enacted P.L 1981, ch. 431 (effective Sept. 18, 1981), which codified the current property exemptions at 14 M.R.S.

4422.[7]  The Legislature's purpose in enacting this new legislation was, in part, to "[m]erge into one list the statutory property exemptions for state collection proceedings and federal bankruptcy proceedings."  L.D. 1642, Statement of Fact (110th Legis. 1981).  However, there is no evidence in this enacting legislation from which we can glean the Legislature's intended meaning of "commercial fishing."

[¶14]  More recently, the Legislature amended section 4422(9), updating the boat–size limitation from five tons to forty-six feet.  *See* P.L. 2013, ch. 510 (effective April 2, 2014).  In doing so, the Legislature stated that the change to the statute was necessary because "the description of a debtor's fishing boat that is *used for income-generating purposes* [was] out of date."  P.L. 2013, ch. 510, Emergency Preamble (emphasis added).  Absent the amendment to section 4422(9), the use of the outdated description would allow for "the attachment of fishing boats that are commonly used in commercial fishing, leading to an inability of the debtor *to generate income*, which is contradictory to the reason for the exemption."  *Id*. (emphasis added)*.*

---

[7]  P.L. 1981, ch. 431 repealed and replaced 14 M.R.S.A. § 4401 (1964), the prior exempt-property statute.

[¶15]  This rationale underlying the enactment of P.L. 2013, ch. 510 was echoed by its sponsoring legislator, who testified that the 2014 amendment was necessary "in order to protect the original intent of the law, to exempt the tools of the trade of individual commercial fishermen who *make their living by use of their boat*." *An Act to Revise the Description of Commercial Fishing Vessels that are Exempt from Attachment: Hearing on L.D. 1778 Before the J. Standing Comm. on Judiciary*, 126th Legis. (2014) (testimony of Rep. Cooper of Yarmouth)(emphasis added).  Additionally, the legislator stated that revising the statute to reflect the increased length of modern fishing boats was "a necessity to continue [the exemption's] usefulness to debtors, to enable them to have a fresh start and to continue to use the skills they have acquired to earn a living." *Id.*

[¶16]  Based on the available legislative history, we deduce that the Legislature's use of the word "commercial" when referring to a boat "used by the debtor . . .  for commercial fishing" was intended to include not only a boat used to catch and *sell* lobsters, but also a boat used by a lobsterman who is compensated to provide the *service* of catching lobsters.  In other words, the phrase "commercial fishing" was intended to include any boats engaged in

fishing "for income-generating purposes." P.L. 2013, ch. 510, Emergency Preamble.

[¶17] This interpretation of "commercial fishing" is consistent with "the whole statutory scheme," of which section 4422(9) forms a part.[8] *Urrutia*, 2018 ME 24, ¶ 12, 179 A.3d 312. For example, the Legislature determined that both "farm equipment" and "logging implements," when they are used "commercially," are also exempt from attachment. *See* 14 M.R.S. § 4422(8), (9-A). Like a fishing boat, farming and logging equipment can be used by a debtor to generate income without selling crops or logs, which allows the debtor to eventually satisfy a debt. If, instead, the law is interpreted to provide that the tools of a debtor engaged in commercial logging are only exempt from attachment when the tools are used to *sell* the wood "harvest[ed] and haul[ed]," but not exempt when used to provide the *service* of "harvest[ing] or haul[ing]

---

[8]  This interpretation is also consistent with our earlier readings of previous versions of the exempt-property statute. *See Martin v. Buswell,* 108 Me. 263, 264, 80 A. 828 (1911) ("[I]t became clearly evident to law makers . . . that it was against sound public policy to take from the artisan or the husbandman by attachment the tools or implements by the use of which alone he could perform the services that would enable him to pay his debt or contribute to the support of his family."); *Walker v. Carkin*, 88 Me. 302, 304, 34 A. 29 (1896) ("Exemptions are intended to preserve to a debtor the means necessary for obtaining a livelihood in his vocation."); *Files v. Stevens*, 84 Me. 84, 85, 24 A. 584 (1891) ("The evident object of the statute is that . . . persons should not be deprived of the simple means by which they gained a livelihood in their respective vocations.").

12

wood," a debtor would face "illogical or inconsistent results," *Andrews*, 2016 ME 68, ¶ 9, 138 A.3d 1197. *See* 14 M.R.S. § 4422(9-A).[9]

[¶18]   Contrary to the court's conclusion that Otis is not engaged in commercial fishing because he does not sell the lobsters he catches, the distinction between selling goods and providing "for pay" the underlying service of catching and releasing lobsters cannot be a distinction that the Legislature intended when it used the phrase "commercial fishing."   As with farm and logging equipment, such a narrow reading of the statute for fishing boats would lead "to an inability of the debtor to generate income, which is contradictory to the reason for the exemption."  P.L. 2013, ch. 510, Emergency Preamble.

[¶19]   Having determined that the meaning of "commercial fishing" in section 4422(9) is ambiguous, and having considered the available legislative history of section 4422, we conclude that the Legislature's intent in providing an exemption for a boat used "for commercial fishing" must include those instances where a debtor uses a boat for catching fish and other marine

---

[9] Our rule of statutory interpretation analyzing the whole statutory scheme is bolstered here by the Legislature's recent exemption for "logging implements," 14 M.R.S. § 4422(9-A), in which the Legislature stated that the exemption is "similar to the exemption already allowed for farm implements and fishing boats for persons employed in commercial farming and fishing." L.D. 1550, Summary (124th Legis. 2009).

organisms, such as lobsters, while "having profit as a chief aim," *Commercial*, American Heritage Dictionary of the English Language (5th ed. 2016), or "for income-generating purposes," P.L. 2013, ch. 510, Emergency Preamble. Thus, it cannot be only the sale of fish or lobsters by a debtor that determines whether the debtor's use of his boat is "commercial." Rather, "commercial" use of a boat must also encompass use for providing the service of setting lobster traps and catching lobsters for compensation.

C.      Application of Section 4422(9)

[¶20]  We now apply our interpretation of "commercial fishing" to Otis's use of his thirty-six foot fishing boat to catch lobsters for the Department. In order to catch these lobsters, he must be, and is, licensed by the State of Maine. *See* 12 M.R.S. § 6421. He uses his boat to set and haul lobster traps, and catches lobsters that are used by the Department as part of its own scientific research. Otis does not sell the lobsters he catches, but as a direct result of the services he provides as a licensed lobsterman, he is paid $16,300 by the Department. Therefore, Otis is engaged in the act of catching lobsters and provides this service "for income-generating purposes," P.L. 2013, ch. 510, Emergency Preamble, and while "having profit as a chief aim," *Commercial*, American Heritage Dictionary of the English Language (5th ed. 2016).

[¶21]   Although Wuori contends that Otis uses his boat for "data collection" rather than commercial fishing, this limited view overlooks the actual *use* of Otis's boat.  In fact, it is the Department that is engaged in lobster "data collection."  Otis, on the other hand, uses his boat to catch and haul lobsters for the Department's data collection purposes.  Although he returns the lobsters to the sea, his hauling and catching is compensated by the Department.  Therefore, Otis's use of his boat constitutes "commercial fishing."

[¶22]   Therefore, the court erred in interpreting and applying section 4422(9) when it concluded that Otis did not use his boat for "commercial fishing" and that his boat was not exempt from attachment.

The entry is:

> Judgment vacated.   Remanded for further proceedings consistent with this opinion.

---

Aaron Fethke, Esq. (orally), Fethke Law Offices, Searsport, for appellant Travis Otis

Christopher K. MacLean, Esq., and Laura P. Shaw, Esq. (orally), Camden Law LLP, Camden, for appellee Erik Wuori

Belfast District Court docket number SA-2019-16
FOR CLERK REFERENCE ONLY